```
 1           IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION
 3
                          - - -
 4   MAURICE ALLEN,              :
                                  :
 5              Plaintiff,        :
                                  :
 6   vs.                          :   CASE NO. C-1-02-492
                                  :
 7   DEERFIELD MFG., INC., a      :   (Judge Hogan)
     Subsidiary of ICE            :
 8   INDUSTRIES,                  :
                                  :
 9              Defendant.        :
                          - - -
10
11         Deposition of JANET FREEMAN, a witness
12   herein, taken by the plaintiff as upon
13   cross-examination pursuant to the Federal Rules
14   of Civil Procedure, and pursuant to notice and
15   stipulations hereinafter set forth, at the
16   offices of Tobias, Kraus & Torchia, 911
17   Mercantile Library Building, 424 Walnut Street,
18   Cincinnati, Ohio, at 9:46 a.m., on August 8,
19   2003, before Kelly Green, RPR, a Notary Public
20   within and for the State of Ohio.
21                        - - -
22
                    Williams and Oliver
23                  6689 Raes Creek Court
                    Loveland, Ohio  45140
24                     (513) 683-9626
```

APPENDIX B

Page 2

1  APPEARANCES:
2      On behalf of the Plaintiff:
3          DAVID G. TORCHIA, ESQ.
           Tobias, Kraus & Torchia
4          911 Mercantile Library Building
           414 Walnut Street
5          Cincinnati, Ohio 45202
6
       On behalf of the Defendant:
7
           RENISA A. DORNER, ESQ.
8          Wise & Dorner, Ltd.
           151 N. Michigan Street, Suite 333
9          Toledo, Ohio 43604
10
11               - - -

Page 3

1          STIPULATIONS
2      It is stipulated by and among counsel for
3  the respective parties that the deposition of
4  JANET FREEMAN, a witness herein, may be taken at
5  this time by the plaintiff as upon
6  cross-examination, pursuant to Federal Rules of
7  Civil Procedure and pursuant to notice; that the
8  deposition may be taken in stenotypy by the
9  notary public and court reporter and transcribed
10 by her out of the presence of the witness; that
11 the deposition is to be submitted to the witness
12 for his/her examination and signature, and that
13 signature is not waived.

Page 4

1              INDEX
2
3  Witness                    Page
4  JANET FREEMAN
5      By Mr. Torchia          5
6
7          EXHIBITS
8  Plaintiff's Exhibit No. 1   39
9  Plaintiff's Exhibit No. 2   64
10 Plaintiff's Exhibit No. 3   64
11 Plaintiff's Exhibit No. 4   78
12 Plaintiff's Exhibit No. 5   82
13 Plaintiff's Exhibit No. 6   95
14 Plaintiff's Exhibit No. 7   98
15 Plaintiff's Exhibit No. 8   99
16 Plaintiff's Exhibit No. 9   105
17 Plaintiff's Exhibit No. 10  106

Page 5

1              JANET FREEMAN,
2  a witness herein, having been duly sworn, was
3  examined and testified as follows:
4          CROSS-EXAMINATION
5  BY MR. TORCHIA:
6      Q.  Ms. Freeman, would you please state
7  your full name and spell it for the record.
8      A.  Janet Freeman, J-A-N-E-T,
9  F-R-E-E-M-A-N.
10     Q.  What's your home address?
11     A.  914 Sharon Drive; Lebanon, Ohio;
12 45036.
13     Q.  You're currently employed by
14 Deerfield Manufacturing, Inc.; is that correct?
15     A.  That's correct.
16     Q.  Have you ever been deposed before?
17     A.  Yes.
18     Q.  When and under what circumstances?
19     A.  Approximately three months ago,
20 concerning an employment on age discrimination.
21     Q.  Who is the plaintiff in that case?
22     A.  Phillip O'Cull.
23     Q.  He's somebody who was not rehired by
24 Deerfield --

2 (Pages 2 to 5)

Page 22

1  coming in to look at the company, give them the
2  information they're looking for, and the time of
3  this meeting in mid January of 2002, can you tell
4  me what discussions you had with Mr. Ice about
5  the sale of the company and how it would affect
6  the employees there?
7      A.   I'm sorry. What was the time frame
8  again that you asked?
9      Q.   Between the time when Mr. Norris --
10 I think you testified before you came back from
11 vacation late November/early December, and Mr.
12 Norris said somebody is looking over the company.
13 This isn't your exact testimony, but basically
14 give them the information they're looking for.
15      Between then and January 17th, 2002,
16 or mid January of 2002 when Mr. Ice conducted
17 this meeting with the employees, can you tell me
18 about any other conversations you had with Mr.
19 Ice about what would happen to employees or what
20 might happen to employees upon the purchase of
21 the company?
22      A.   Mr. Ice actually sat down with
23 myself and Dave Randall and gave us an idea of
24 what he was looking for and the way that they

Page 23

1  would change production, and the overall running
2  of the manufacturing floor would go into a whole
3  different concept as to what we were doing.
4      And he left the hiring of the
5  employees to us -- the evaluation and the hiring
6  to us. He basically set the tone as to what he
7  was looking for in employees.
8      Q.   And this is in a meeting with you
9  and Mr. Randall?
10     A.   Yes.
11     Q.   Was it one meeting or a series of
12 meetings?
13     A.   No. It was one meeting.
14     Q.   And was it around mid January, or
15 was it sometime before that?
16     A.   I don't recall. I don't know if it
17 was the -- probably about the first week or two
18 of January. It would have been prior to the
19 meeting.
20     Q.   Tell me what Mr. Ice said to you and
21 Mr. Randall about the type of employee he was
22 looking for.
23     A.   He was looking for someone that was
24 fast-paced, that could keep up with production,

Page 24

1  that would be expected to make rates out there on
2  the floor; good attendance; good work ethics.
3      We needed somebody to be a team
4  player; people who weren't afraid to step up into
5  team lead position; and in absence of team
6  leaders, to be able to step up. He wanted
7  dedicated employees.
8      Q.   Do you remember anything else that
9  he said at that meeting with you and Mr. Randall?
10     A.   No.
11     Q.   Do you remember anything that you or
12 Mr. Randall said to Mr. Ice in response to what
13 he described as the type of employees that he
14 wanted?
15     A.   I know that there were some
16 questions asked because I was curious as to how
17 the team concept would work, to get a little more
18 specific on the team concept.
19     And then he had given me a name to
20 contact at his other plant on the
21 responsibilities of, per se, a team leader and
22 what that team concept was so I would have a
23 better understanding.
24     Q.   Where is his other plant?

Page 25

1      A.   Toledo, Ohio.
2      Q.   Do you know what the name of that
3  company or facility is?
4      A.   Acklin Stamping.
5      Q.   A-K --
6      A.   A-C-K-L-I-N.
7      Q.   The team concept is basically
8  allowing the team to set the schedule for
9  employees, set their hours, do that sort of --
10 they become much more autonomous than having a
11 supervisor at some other level run their shift
12 and run their production; is that generally what
13 you're talking about?
14     A.   No, not really. In the team
15 concept, they're assigned to specific machines.
16 They know what the rates are for those machines.
17 They know going into that.
18     They don't chose what's being
19 produced or what that schedule is. That's
20 already set for them. It's their responsibility
21 to go out and make the rates.
22     If there's -- take more
23 responsibility in the quality end and into the
24 product that they're making as a team versus

Page 26

1  waiting until the product is done and then having
2  a quality person then coming up and saying these
3  are bad parts. We want to know that from the
4  onset.
5      Their involvement would deal more
6  with the quality end, being able to make those
7  rates, decisions on that part of it.
8      Q.  And that's what he wanted to see
9  happen here?
10     A.  Yes.
11     Q.  Has that been implemented?
12     A.  Yes, it has.
13     Q.  Do you remember anything else about
14 your discussion with Mr. Randall and Mr. Ice in
15 early January 2002?
16     A.  I can't think of anything else at
17 this time.
18     Q.  Was there any discussion at that
19 point in time with Mr. Ice about what to do with
20 employees who were off on some sort of leave of
21 absence and weren't actively working?
22     A.  No.
23     Q.  Not with Mr. Ice?
24     A.  No.

Page 27

1      Q.  How about with Mr. Randall or
2  anybody else here, was there a discussion about
3  what to do with those on leave of absence?
4      A.  We sat down with the list. We both
5  had the same list, and we basically set a
6  criteria as to evaluate the employees.
7      Q.  What were the criteria?
8      A.  Who were actively working employees.
9  I'm sorry. I just drew a blank. They had
10 applied for a position with the company. My mind
11 just went blank. I'm sorry.
12     Q.  Was there any discussion about
13 opportunities for employees who were not actively
14 working, like Mr. Allen and Mr. Baker...
15     A.  No.
16     Q.  ...under what circumstances they
17 could come to work for this new company or the
18 new owner?
19     A.  We did not set any criteria for
20 that. We were looking at employees -- and those
21 employees who could begin work on 2/1 was another
22 criteria for us.
23     Q.  In terms of actively working
24 employees, do you remember having any discussion

Page 28

1  about some sort of adverse affect on employees
2  who were off on a Worker's Comp leave or Family
3  Medical Leave Act; did you just eliminate those
4  people from consideration?
5      A.  On anybody that was on any type of
6  leave, they were not considered. Now, Earl Baker
7  -- when he came back -- then was considered for a
8  position at Deerfield.
9      The other criteria was on
10 attendance. If an employee was in a probationary
11 period with the old company, we did not bring
12 those new employees -- or those employees on as a
13 new employee.
14     Q.  If you know, was there a written
15 agreement between Mr. Norris and Deerfield
16 Manufacturing Company and Mr. Ice and Deerfield
17 Manufacturing, Inc., about the purchase of the
18 company and the assets and those things?
19     A.  My understanding -- and I -- as I
20 said, this is my understanding, that it was an
21 asset sale, and the employees were not considered
22 part of that asset.
23     Q.  Do you know if there was anything
24 relating to employees in the purchase agreement

Page 29

1  or the buy/sell agreement?
2      A.  I do not, other than they were not
3  considered part of the asset.
4      Q.  Did you have any discussion with Mr.
5  Ice or anybody else about what personnel policies
6  and procedures would go into effect between
7  January 31st and the new company taking over?
8      A.  Yes, I did.
9      Q.  Tell me about that.
10     A.  We had to rewrite the handbook.
11     Q.  Who was involved in that?
12     A.  Myself primarily; and then once I
13 had gone through the handbook, then I sat down
14 with Mr. Ice -- I don't know if there was anybody
15 else present at that time or not -- and we went
16 through the handbook.
17     Q.  That's a different meeting you had
18 with Mr. Ice?
19     A.  Yes.
20     Q.  When was that?
21     A.  Sometime in January.
22     Q.  You said it was before or after the
23 meeting you had with Mr. Ice and Mr. Randall?
24     A.  I'm sorry. I really -- I don't

Page 50

1  already completed?
2  A. Yes, because of the time frame and
3  the 2/1 start date.
4  Q. Did you mail any of these packets to
5  the employees like Mr. Allen who were off on
6  some sort of leave?
7  A. No, I did not.
8  Q. Did you make any attempt to
9  communicate with Mr. Allen and the other
10 employees off on leave about this packet and the
11 application process?
12 A. No, I did not.
13 Q. During the course of either of these
14 two meetings, did any employees ask questions
15 about the selection process of whether they would
16 have a job or not have a job?
17 A. Not that I recall.
18 Q. Are there any tape recordings of the
19 meetings; do you know?
20 A. No.
21 Q. Are there any notes of the meetings?
22 A. I did make some notes.
23 Q. Do you still have those?
24 A. I believe I do, yes.

Page 51

1  Q. Do you remember what they refer to?
2  A. Just what Mr. Ice had talked about.
3  I don't think they were very detailed. They were
4  just like a point type...
5  Q. Along with a packet that you
6  prepared, was there any sort of cover sheet with
7  information about whether or not Manufacturing
8  Company employees would be considered Inc.
9  employees as long as they filled out an
10 application, anything to go with the packet?
11 A. No.
12 Q. Was any information about the
13 application process posted on the bulletin board
14 or anywhere else?
15 A. No.
16 Q. Is there anything else you remember
17 about either of the two meetings in mid January
18 when you passed out these packets and Mr. Ice
19 introduced Mr. Swick -- do you remember anything
20 else that was said?
21 A. No.
22 Q. Did Mr. Swick say anything that you
23 remember?
24 A. Said he looked forward to working

Page 52

1  with the employees.
2  Q. Had he been up in Toledo before?
3  A. No. He worked for another company,
4  but I don't -- I don't know if that was Toledo
5  Technologies at that time or what his background
6  was at that time.
7  Q. He came to Deerfield Manufacturing,
8  Inc., as the general manager?
9  A. Yes.
10 Q. And has been physically located here
11 since then?
12 A. Yes.
13 Q. He's still here?
14 A. Yes.
15 Q. Now, it appears -- there doesn't
16 seem to be much dispute about this -- about a
17 week after that meeting, Mr. Allen made an
18 attempt to get ahold of you to talk about coming
19 back to work; is that right?
20 A. That's correct.
21 Q. And his testimony yesterday was that
22 he left a message with Sharon about the
23 application process. Do you remember having any
24 discussion with Sharon about the message that Mr.

Page 53

1  Allen left?
2  A. I don't. The only -- I do recall
3  our conversation on the 24th.
4  Q. Your conversation --
5  A. With Mr. Allen. I don't recall if I
6  called him or he called me. Mr. Allen -- each
7  time that I received a note from the doctor, he
8  would call to verify that I did receive it.
9      And it was right around that time
10 frame, and I think I had stated in my book that I
11 did note that there was M. Allen on 2/4 -- a
12 release date of 2/4/02.
13 Q. So whether you got that because you
14 saw the release date or you talked to Mr. Allen,
15 you made that note on January 24th?
16 A. I more than likely had made the note
17 that I had received it.
18 Q. From his chiropractor?
19 A. From the doctor, correct.
20 Q. So you don't remember any discussion
21 about the conversation -- a conversation she may
22 have had with Mr. Allen on the 23rd?
23 A. No.
24 Q. But you do remember speaking with

## Page 54

1  Mr. Allen on the 24th?
2      A.  Yes, I do.
3      Q.  And you have notes of the
4  conversation?
5      A.  I don't have notes of the
6  conversation other than it states 2/4/02 -- a
7  release date 2/4/02.
8      Q.  Tell me what you remember about your
9  conversation with Mr. Allen on January 24th?
10     A.  He asked if I had received the
11 information from the doctor, and I stated that I
12 did.  Mr. Allen said that he had heard that the
13 company was selling and that he would -- asked me
14 if I would give Venita Watson a packet that the
15 other employees had received to fill out.
16         And I stated that I would not; that
17 he was welcome to come in and put an application
18 in after 2/4 as that was when the doctor released
19 him.
20     Q.  Do you remember anything else about
21 that conversation?
22     A.  No, I do not.
23     Q.  Did you talk to Venita Watson about
24 any information she had given to Mr. Allen or any

## Page 55

1  conversation she had with him?
2      A.  No, I do not.
3      Q.  When you told Mr. Allen that he
4  could come in after February 4th when the doctor
5  released him, did he say anything to you?
6      A.  Not that I recall.
7      Q.  When you ended that conversation,
8  did you have some expectation of seeing Mr. Allen
9  sometime on February 4th or after that so that he
10 would fill out an application?
11     A.  He didn't state in the conversation
12 he was coming in or he would see me on 2/4.  That
13 was the end of our conversation.
14     Q.  Did you say to him, I'll see you
15 then on the 4th or whenever you're released?
16     A.  No, I did not.
17     Q.  Did you give him any instructions at
18 that point in time about how he could go about
19 getting an application on the 4th?
20     A.  I did state that our applications
21 are in the hallway -- personnel hallway.  They're
22 on a desk located out in the personnel hallway.
23     Q.  And that was on the 24th?
24     A.  That was on the 24th.

## Page 56

1      Q.  We're in a conference room here on
2  the second floor.  When I came in, I saw a door
3  that said human resources office.  Is that --
4      A.  Correct.  That would be the
5  personnel hallway.
6      Q.  And that's where the applications
7  are kept or left?
8      A.  At that time, that's where they were
9  kept, and that had been in place since 2000 --
10 since about February of 2000.
11     Q.  You mean the applications being
12 available there?
13     A.  Yes.
14     Q.  Do you remember any conversation or
15 any discussion you had with Mr. Allen between
16 January 24th and February 4th?
17     A.  No, other than the conversation on
18 the 24th.
19     Q.  Right, you had that, which you just
20 told us about.  You don't remember anything
21 between then and February 4th?
22     A.  No.  There was no other
23 conversations from then until February 4th.
24     Q.  Had the decision been made as of

## Page 57

1  January 24th that Mr. Allen would not be hired by
2  the new company?
3      A.  I would have to look at a calendar
4  to what that week was prior to the sell of the
5  company.  I think we sat down the Monday prior to
6  the Friday before 2/1 and went over our list.  It
7  would have been... about the 28th would have been
8  when we went over that.
9      Q.  You and Mr. Randall?
10     A.  Yes.
11     Q.  Is that the meeting you were telling
12 me about before where you went over a list, or is
13 that a different meeting?
14     A.  This is a separate time frame.
15     Q.  So the sequence of events is you
16 have this discussion with Mr. Allen on the 24th?
17     A.  Yes.
18     Q.  And then on the 28th or sometime
19 around the 28th -- what did you say, the Monday
20 before the...
21     A.  It was the Monday before the sale --
22 or before the actual sale took place or when it
23 went into effect.
24     Q.  Do you know what date the sale took

Page 78

1  A. I don't know that.
2  Q. Why was he on leave?
3  A. It was for a personal illness.
4  Q. Is he getting any sort of
5  short-term/long-term disability benefits?
6  A. He didn't offer long-term.
7  Q. By January 31st of 2002, he had not
8  made any attempt to return to work or presented
9  you with any medical documentation?
10  A. No, he did not. Mr. Collett did
11  call me at some point before January 31st and
12  said that he did hear that the company was for
13  sale and that he would not be returning to work.
14  He was not able and he would not be returning to
15  work.
16      (Plaintiff's Exhibit No. 4 was marked
17      for identification.)
18  Q. Exhibit 4 is a letter from you to
19  Mr. Allen dated January 30, 2002, advising him
20  that Deerfield Manufacturing Company had been
21  sold and his employment would cease as of the
22  31st, right?
23  A. Yes.
24  Q. Was there anyone else that you sent

Page 79

1  a letter like this to?
2  A. Mr. Collett would have received
3  something similar to that.
4  Q. Anybody else?
5  A. Not that I can recall.
6  Q. How about Mr. Osborne, the other
7  people that weren't hired, Ms. Shelton, Mr. Wyatt
8  -- I'm sorry -- Mr. Fowler, Ms. Davis, did they
9  all get letters like this?
10  A. No, they did not.
11  Q. Why not?
12  A. They were advised by the supervisor
13  they would no longer be working, or that as of
14  the sale of the company, they were no longer
15  employed.
16  Q. So they got verbal notification from
17  their supervisors?
18  A. Yes, they did.
19  Q. Did they get Cobra forms?
20  A. Yes.
21  Q. From their supervisors or from you?
22  A. No. It would have been -- and I --
23  I don't recall if we sent those out or if that
24  was sent out by the Stolle Company on those

Page 80

1  persons.
2  Q. But in terms of a letter in the form
3  of Exhibit 4, Mr. Allen and Mr. Collett were the
4  only two people you can recall that would have
5  gotten those letters?
6  A. Yes.
7  Q. And they were sent because they
8  weren't actively working and weren't in a
9  position to get verbal notification from their
10  supervisors?
11  A. If Mr. Allen would have been here
12  and would have been evaluated and if that were
13  the case, then he would have received a verbal.
14  Q. Is there any reason why you just
15  didn't call Mr. Allen on January 30th or 31st and
16  say, I'm sorry to tell you that your employment
17  is going to end as of tomorrow?
18  A. We felt that written notification
19  because he was not here would be necessary.
20  Q. But you also knew that he had been
21  released to return to work effective February 4th
22  and that he was interested in coming back to work
23  and filling out an application, didn't you?
24  A. He had not filled out an application

Page 81

1  or to my knowledge had not come in to pick up an
2  application.
3  Q. But he expressed an interest to you
4  on January 24th?
5  A. He asked for a packet like the other
6  employees to be hired, and I stated that he could
7  fill out an application.
8  Q. He also asked if you got his
9  doctor's release releasing him on the 4th, right?
10  A. Yes, but he also called numerous
11  times before asking if I had gotten the doctor's
12  notification as well.
13  Q. Is it your testimony that you had no
14  idea that Mr. Allen wanted to come back to work
15  on February 4th; is that what you're saying?
16  A. No, that is not what I'm saying.
17  Q. So you knew he had an interest in
18  coming to work with this new company?
19  A. He had a doctor's release releasing
20  him to come back to work on 2/4/02.
21  Q. And he asked you about a packet with
22  the applications in it?
23  A. Yes. He had asked if I would send
24  one home with an employee.

21 (Pages 78 to 81)

Page 82

1  Q. Which indicated to you some interest
2 on his part in coming to work, right?
3  A. (Witness nods head up and down.)
4  Q. At least filling out an application
5 and being considered for work, correct?
6  A. Yes.
7  (A brief break was taken.)
8  (Plaintiff's Exhibit No. 5 was marked
9  for identification.)
10 BY MR. TORCHIA:
11  Q. Exhibit 5 is another status report
12 for Mr. Allen. That indicates that he's been
13 terminated due to company closure as of January
14 31st, 2002; is that right?
15  A. Yes.
16  Q. Your signature is here. Do you know
17 if anybody else's writing appears on this
18 document?
19  A. No. That would have been my
20 writing.
21  Q. It says date issued February 4th,
22 2002. Is that when you filled this out?
23  A. Yes.
24  Q. Do you know at what point in the day

Page 83

1 on February 4th you filled that out?
2  A. No, I do not.
3  Q. Do you remember if it was before Mr.
4 Allen came to the plant or after?
5  A. I do not recall.
6  Q. Tell me what you remember about your
7 interaction with Mr. Allen on February 4th.
8  A. I was out in the plant as it was a
9 new time card system, various things with the new
10 team concept, and we had various managers out on
11 the floor.
12  But as far as the conversation, I
13 was out on the floor, and Mr. Allen walked into
14 the plant. And I asked him what he was doing at
15 the plant, and he said he came to work for the
16 new company.
17  And I asked him if he had received
18 the letter from Deerfield Company terminating his
19 employment. He said he had. And he said he came
20 to fill out the packet like the other employees.
21  I stated he was welcome to fill out
22 an application, and I pointed to this back area,
23 that they were kept in the personnel hallway.
24  Mr. Allen stated that he had

Page 84

1 something in the locker room, and I had advised
2 him that the locker room had been cleaned out in
3 December, but he was more than welcome to go back
4 and see if there was anything still there that
5 belonged to him.
6  We walked down the aisleway. I
7 advised him that he was going to have to leave
8 the plant. I wished him luck and he left.
9  Q. Were you with him when he got
10 whatever it was that he left?
11  A. I didn't walk into the men's locker
12 room with him.
13  Q. Were you with him when he came out
14 of the locker room?
15  A. I was standing at the entrance
16 there, and then we walked up the aisle together.
17  Q. Do you remember what he got out of
18 the locker room?
19  A. No, I don't recall.
20  Q. Is the time clock on the plant
21 floor?
22  A. Yes. It's as you enter the building
23 at the employees' entrance.
24  Q. Did you see him come into the

Page 85

1 building?
2  A. I can't recall actually seeing him
3 enter the building. I know that I was close to
4 the time card or over in that aisleway over near
5 the time clock -- excuse me -- and over in the
6 main aisleway there. I don't recall meeting him
7 at the door.
8  Q. Were you waiting for him to arrive
9 on the 4th?
10  A. No, I was not. We had installed a
11 new time card system which required scanning,
12 versus the old time clock to where they actually
13 punched it; and I was out there because of
14 helping any employee that might have any problems
15 that might arise or any questions that they might
16 have.
17  Q. Okay. So he showed up?
18  A. Yes.
19  Q. Was there anyone else around when he
20 showed up?
21  A. Not that I'm aware of. There were
22 employees out on the floor in there starting to
23 work -- had already started working.
24  Q. Mr. Allen's tone throughout the

Page 86

1  whole entire conversation was professional; he
2  didn't act in any inappropriate way with you, did
3  he?
4     A.  No.
5     Q.  And he said he came to fill out the
6  packet?
7     A.  He said he came to work for the new
8  company.
9     Q.  But he also, you testified --
10    A.  And then he stated -- yes, he also
11 stated that he came out to fill out a packet like
12 the other employees.
13    Q.  And he said you pointed to the
14 hallway --
15    A.  Yes. I pointed -- at that point,
16 where I would have been standing, I would have
17 pointed in this direction (indicating). And I
18 said he was more than welcome to fill out an
19 application. They were located in the hallway,
20 the personnel hallway.
21    Q.  And then you escorted him to the
22 locker room and escorted him out of the plant?
23    A.  Yes, I did.
24    Q.  Before he left, did you say, I

Page 87

1  thought you wanted to fill out an application; go
2  do it while you're here?
3     A.  No, I did not.
4     Q.  So you didn't remind him before he
5  left to do that?
6     A.  No.
7     Q.  Other than you pointing to where the
8  applications were kept and telling him he was
9  welcome to fill one out, was there any other
10 discussion about -- and him saying he wanted to
11 fill out the packet like the other employees, was
12 there any other discussion about applications or
13 packets that morning on the 4th?
14    A.  On the 4th, no, other than when he
15 entered the plant where the employees were
16 working. He had mentioned that he came to work
17 for the new company, and then he had mentioned
18 that he came to fill out his packet like the
19 other employees.
20    Q.  After he left, did you talk to
21 anybody about what had just happened?
22    A.  When I came up to personnel, I did
23 make note to Sharon that Maurice Allen had been
24 in the plant, and I believe that was about the

Page 88

1  end of our conversation.
2     Q.  Did she say why or --
3     A.  No. With everything that was going
4  on that day with the time clock system and trying
5  to get everything organized, there wasn't too
6  much room to...
7     Q.  Did you tell Mr. Allen that he could
8  go down and apply for unemployment?
9     A.  I don't... no.
10    Q.  Did not?
11    A.  No, I did not.
12    Q.  He did go down and apply for
13 unemployment. You're aware of that?
14    A.  No, I'm not aware of that.
15    Q.  Did you ever get any information
16 from the Ohio Bureau of Employment Services about
17 his application?
18    A.  I don't recall seeing anything like
19 that.
20    Q.  Do you remember having any
21 discussion with anybody about his application for
22 employment benefits?
23    A.  No.
24    Q.  Who normally --

Page 89

1     A.  It would either have been through
2  comp management or that possibly could have come
3  from Stolle. I'm not... again, I have... would
4  have to see that paperwork. I really don't
5  recall it.
6     Q.  As of February 4th, you had ads in
7  the paper for two, three, four weeks looking for
8  operators?
9     A.  Not that length of time, no. It
10 would have been placed that last -- probably the
11 last week or the first week of February that we
12 placed an ad for second shift operators.
13    Q.  I thought you said there was some
14 sort of package deal with the paper where you got
15 two or three or four weeks?
16    A.  We did, but it didn't start until
17 that last -- like it would have started the last
18 week of January or the first week of February and
19 carried on throughout that time frame, through
20 the month of February.
21    Q.  So there were ads in the paper for
22 operators throughout the month of February?
23    A.  Yes. Actually, I think the ad was
24 operators and packers for our second shift.

Page 90

1  Q. And Mr. Allen, at the time he left
2  the company, had been reclassified as an
3  operator, right?
4  A. That's correct. He did not have
5  knowledge of that.
6  Q. But he was in the classification
7  that you were seeking in these ads in the paper,
8  right?
9  A. That's correct.
10 Q. And you don't remember any
11 discussion with anybody about Mr. Allen's
12 unemployment claim?
13 A. No, I don't recall that.
14 Q. You don't remember telling anybody,
15 We should contest this claim because we've had
16 work available for Mr. Allen, and all he has to
17 do is apply for a job?
18 A. No, I don't recall contesting any --
19 or discussing that.
20 Q. If Mr. Allen had filled out an
21 application on February 4th, what would have
22 happened with it?
23 A. As far as what do you mean what
24 would have happened?

Page 91

1  Q. What would the process have been?
2  If he had filled out an application, it would
3  have come to you?
4  A. Yes, the application would have came
5  up to the human resource department.
6  Q. What would have happened?
7  A. At some point in time, we would have
8  looked at the applications when I started to
9  interview.
10 Q. So you would have treated him the
11 same as some outside applicant?
12 A. We would have looked at -- knowing
13 that he had worked for the company before, we
14 would have looked at his record at that point in
15 time.
16 Q. Is there any reason why Mr. Allen
17 wouldn't have been hired as a result of an
18 application on February 4th that you know of?
19 A. Other than as of today or as of
20 February 4th?
21 Q. Through the month of February, you
22 had openings; you were advertising in the paper.
23 If he filled out an application on the 4th,
24 knowing there were positions available then for

Page 92

1  his classification, is there any reason you know
2  of he wouldn't have been hired in the month of
3  February 4th?
4  A. When he was working here at
5  Deerfield, it was that as a forklift operator.
6  So I did not have a forklift operator's position
7  open. I advertised for an operator.
8  Even though we reclassed him as an
9  operator, when Mr. Allen came back, he would have
10 been given that choice whether he chose that
11 position or not, and that's as an actively
12 working employee for Deerfield Manufacturing
13 Company.
14 Q. Is there any reason that Mr. Allen
15 wouldn't have been hired in February of 2002 had
16 he filled out an application?
17 A. For a punch press operator's
18 position?
19 Q. For an operator's position.
20 A. We would have considered his
21 application.
22 Q. Do you know if he'd ever been a
23 punch press operator at the company in his
24 previous years with the company?

Page 93

1  A. I believe he had at some time.
2  Q. As you were considering applications
3  of other people for operators, did it ever cross
4  your mind that Mr. Allen was out there and
5  available?
6  A. No, because I did not receive an
7  application from him.
8  Q. You eventually received an EEOC
9  charge from him, right?
10 A. Yes.
11 Q. At that point in time, did you
12 consider that he was interested in coming back to
13 work and wanted to come back to work and was
14 upset that he wasn't back to work with the
15 company?
16 A. On the EEOC charge that he had
17 filed, I felt he was very discontented with what
18 had transpired.
19 Q. What caused you to say that?
20 A. Because of the accusations that were
21 made.
22 Q. What accusations?
23 A. That it was the first one based on
24 racial discrimination.

Page 98

1  (Plaintiff's Exhibit No. 7 was marked
2  for identification.)
3  Q. Exhibit 7 is I think what you were
4  just referring to as your answer to the EEOC; is
5  that right?
6  A. That's correct.
7  Q. Did you write this yourself, or did
8  anyone assist you in writing it?
9  A. No, I wrote this myself.
10 Q. Everything you say in this letter is
11 true and accurate?
12 A. Yes.
13 Q. Is there any other information that
14 you supplied to the EEOC besides this letter and
15 what was attached?
16 A. I believe -- I want to read the
17 letter quickly here. (Examining document.)
18     Yes. It says I have attached a
19 letter that was sent to Mr. Allen by the previous
20 owner, Deerfield Manufacturing Company,
21 terminating his employment. So the letter in
22 Exhibit 4 would have been attached to this.
23 Q. In the first paragraph, you say,
24 Actively working employees did include black and

Page 99

1  other minorities. All were hired by Deerfield
2  Manufacturing, Incorporated.
3      Not all actively working employees
4  as of January 31st, 2002, were hired by Deerfield
5  Manufacturing, Inc., were they?
6  A. All black and other minority workers
7  of Deerfield Company were hired by Deerfield,
8  Inc.
9  Q. Is that what that means?
10 A. Yes.
11 Q. All blacks and minorities were
12 hired?
13 A. Yes.
14 Q. Was Carl Roth hired by Deerfield
15 Manufacturing, Inc., at some point in time?
16 A. Yes, he was.
17 Q. When was he hired?
18 A. He was hired on February the 4th for
19 second shift as an operator.
20     (Plaintiff's Exhibit No. 8 was marked
21 for identification.)
22 Q. This exhibit appears to be a copy of
23 Mr. Roth's application; is that right?
24 A. Yes.

Page 100

1  Q. Do you know if he filled this out on
2  February 4th?
3  A. I believe he -- looks like he signed
4  it on January 28th.
5  Q. Is any of this writing yours?
6  A. No.
7  Q. There's also a date in the upper
8  right-hand corner that says date, February 4th,
9  2002?
10 A. Yes.
11 Q. Did you meet with him on whenever
12 day it was that he signed this?
13 A. What do you mean that he signed
14 what? The application?
15 Q. The application.
16 A. He would have filled the application
17 and brought it up to us.
18 Q. Do you remember receiving it on
19 February 4th from him?
20 A. I don't know if it was February 4th
21 or January 28th that we received it. I believe
22 it to be January 28th.
23 Q. Do you remember having any
24 discussion with him at about the time you

Page 101

1  received this?
2  A. Yes.
3  Q. What do you remember?
4  A. I would have at that point in time
5  -- I'm not sure if it was the day that I received
6  this or after the fact, because I know we met on
7  the 28th looking at employees and the production
8  needs and where we would be and what our needs
9  would be.
10     So I don't recall if I did it on the
11 28th or later in the week -- had talked to Mr.
12 Roth about employment with Deerfield
13 Manufacturing, Incorporated.
14 Q. Was he discussed in your meeting
15 with Mr. Randall on the 27th or 28th?
16 A. No. He was not on our employee
17 list.
18 Q. In your meeting with Mr. Randall,
19 you didn't talk about any applications or new
20 applications from non-current employees?
21 A. No, we did not.
22 Q. And he was hired for an operator
23 position on the second shift, right?
24 A. Yes.

Page 102

1  Q. Did he actually begin on February
2  4th?
3  A. Yes, he did, on second shift.
4  Q. So within a few days of the time he
5  turned in his application, he was working with
6  the company?
7  A. Yes.
8  Q. Do you know what his job was
9  previously working at the company?
10  A. He had different jobs with the
11  company. I believe he was -- I don't know if he
12  was a blanking line operator at the time or if he
13  was an operator with the company. He could have
14  been QC, also, quality control.
15  Q. He applied for, at least according
16  to the application, the blanking line, first
17  shift?
18  A. He applied blank line first or any.
19  Q. Just so that the record's clear, he
20  says in his application that he worked at
21  Deerfield from November of '93 to June of '02.
22  That should be June of '01; is that right?
23  A. Yes.
24  Q. His comment here is that 10.50 an

Page 103

1  hour was not enough income. That's his reason
2  for leaving Conner & Murphy, at least that's what
3  he states. Did you talk to him about that?
4  A. I don't recall talking to him about
5  the not enough income. I know at previous
6  conversations, he was not happy where he was
7  working. He was not getting in as much time and
8  sometimes too much time because he was on call 24
9  hours.
10  Q. In your previous conversations with
11  him when he would call and ask if there was any
12  hiring, did he say anything about not getting
13  enough income?
14  A. No, I don't recall that.
15  Q. And do you know what his starting
16  rate of pay was for Ice Industries?
17  A. I would have to go back and look at
18  what we were paying at the time.
19  Q. But you said before, everybody
20  received the 50 cent per hour increase with the
21  new company?
22  A. Right. That's correct.
23  Q. And that would have included him?
24  A. Well, the pay scale -- wherever that

Page 104

1  pay scale was, wherever he was as an operator,
2  that's where it would start. Plus on second
3  shift, we pay a 50 cent shift deferential.
4  Q. When you and Mr. Randall were
5  talking about who was going to be hired and who
6  wasn't, did the people who came back -- who
7  started with Deerfield Manufacturing, Inc., all
8  have the same jobs that they had when they worked
9  for Deerfield Manufacturing Company?
10  A. No, they did not, not all employees.
11  Q. So there was movement of employees
12  from operators to some other job or forklift
13  driver to operator?
14  A. Most it would have been just the
15  opposite of the onset. It would have been
16  indirect to direct labor is what we looked at.
17  Q. Okay.
18  A. So those positions, rather it have
19  been a forklift operator to a press operator.
20  Q. But you've never said, and it's not
21  the company's position, that there wasn't work
22  available for Mr. Allen on February 4th of 2002;
23  is that right?
24  A. I've never said there was not work

Page 105

1  for him, no. I stated that.
2  Q. There was work available on February
3  4th?
4  A. Operating positions. We had
5  positions open on our second shift for operators.
6  Q. Which is what Mr. Roth was able to
7  do within a space of a couple days or few days,
8  apply or come to work within a week's time or
9  less?
10  A. Yes, on the second shift.
11     (Plaintiff's Exhibit No. 9 was marked
12     for identification.)
13  Q. Exhibit 9 is a two-page exhibit that
14  was produced as part of Mr. Allen's personnel
15  file, and I want to ask you about it because
16  there's no indication about who put it together
17  or when or what it has to do with. Is this
18  something you wrote?
19  A. No, this is not. At one point in
20  time, Deerfield Company kept a card on each
21  employee; and basically, you could pull that card
22  to see what classification they were in, the
23  rate, and the dates that that transpired instead
24  of having to pull the files.

Page 106

```
 1      Q.   So --
 2      A.   It doesn't look like it was
 3  completed and updated.
 4      Q.   This document wasn't considered and
 5  has nothing to do with Mr. Allen not coming to
 6  work for Deerfield Manufacturing, Inc.?
 7      A.   No. We didn't look at files, no.
 8           (Plaintiff's Exhibit No. 10 was marked
 9  for identification.)
10      Q.   Ms. Freeman, Exhibit 10 is a copy of
11  Defendant's Answers to the Plaintiff's First Set
12  of Interrogatories.
13           You've signed off on these as
14  indicating that the answers are true and correct
15  to the best of your knowledge, information, and
16  belief, right?
17      A.   Yes.
18      Q.   And just for the record and for the
19  sake of completeness, what have been marked as
20  Exhibit 2 and 3 were attached to these Answers to
21  Interrogatories. I just separated them so it
22  would be easier to look at. All right?
23      A.   Okay.
24      Q.   Exhibit 3 is a list of employees
```

Page 107

```
 1  hired or at least working at Deerfield
 2  Manufacturing, Inc., as of February 1st, 2002.
 3  The company continued to hire people after that,
 4  right?
 5      A.   Yes.
 6      Q.   Mr. Roth was one of those additional
 7  people that were hired?
 8      A.   That's correct.
 9      Q.   Mr. Allen has brought the name up of
10  Carrie somebody. He doesn't know the last name.
11  Is there someone named Carrie who was hired by
12  the company after February 1st of 2002?
13      A.   Yes.
14      Q.   Who is that?
15      A.   Carrie Nelson Gibson. She recently
16  married.
17      Q.   When was she hired?
18      A.   2/4.
19      Q.   In what position?
20      A.   As an operator on second shift.
21      Q.   Same as Mr. Roth?
22      A.   Yes.
23      Q.   What's her race?
24      A.   White or caucasian.
```

Page 108

```
 1      Q.   Mr. Roth is caucasian?
 2      A.   Yes.
 3      Q.   When did Ms. Gibson fill out an
 4  application?
 5      A.   I would have to look at the date in
 6  which she filled out an application.
 7      Q.   It would have been February 4th or
 8  before, right?
 9      A.   Yes.
10      Q.   She was not an existing employee as
11  of January 2001, was she -- I'm sorry, 2002?
12      A.   As of January 2002, no, she was not.
13      Q.   Do you know how she came to fill out
14  an application?
15      A.   She again was one of those persons
16  that had called on numerous occasions looking to
17  see if we were hiring, and she also had called.
18  I told her she was more than welcome to come in
19  and fill out an application.
20      Q.   How long had she worked at the
21  company before?
22      A.   I would have to go back and look at
23  her record to see when she started with the
24  company.
```

Page 109

```
 1      Q.   Do you know when she left?
 2      A.   Somewhere I would say spring/summer
 3  of 2002.
 4      Q.   Around the same time as Mr. Roth?
 5      A.   I'm sorry, 2001.
 6      Q.   Around the same time as Mr. Roth?
 7      A.   I would have to go back and look at
 8  her record for a specific date.
 9      Q.   Several months before the
10  changeover?
11      A.   Yes. Oh, most definitely.
12      Q.   Do you know how many other employees
13  were hired after February 1st, 2002?
14      A.   No, I do not.
15      Q.   Is there some way --
16      A.   You mean up till today or -- I would
17  have to go back. I could, you know, look at the
18  number of employees we had at that time versus
19  today. I believe we were somewhere -- including
20  all of our salaried position, we were about
21  120-125, and I think we're about 150-151 as of
22  2003 -- as of August 2003.
23      Q.   So the company has grown since, at
24  least in terms of numbers of employees?
```

28 (Pages 106 to 109)

# STATUS REPORT

CLOCK NO. __404__ NAME __Maurice Allen__ HIRED __9-30-1996__ RATE __$10.61__ DATE ISSUED __11-5-2001__

PRESENT CLASSIFICATION __FL-OP__ REHIRED _____ RATE _____

| CHANGES: | EFFECTIVE 11-5-2001 | | PREVIOUS RATE | | | | |
|---|---|---|---|---|---|---|---|
| TRANSFER | FROM | | DATE ISSUED | | | | |
| | TO | | | | | | |
| RECLASS | FROM FL-OP | | TYPE RATING | | | | |
| | TO A-OPERATOR | | APPROVED | | | | DATE |
| RATE | FROM | | FOREMAN | | | | |
| | TO | | SUPT. | | | | |
| CLOCK NO. | FROM | | FACTORY MGR. | | | | |
| | TO | | | | | | |

COMMENTS

• due to slow down of business currently on sick leave - (wages-same)

SHIFT NO. __1st__

S.S. NO. _____

BIRTHDAY _____

## WORK EVALUATION

IMPROVEMENT IN QUALITY _____   FOLLOWS INSTRUCTIONS ACCURATELY _____

INCREASE IN QUANTITY _____   ATTENTION TO JOB _____

CARE OF EQUIPMENT _____   ATTENDANCE _____

ABILITY TO LEARN _____   WORKS SAFELY AND NEATLY _____

PHYSICALLY SUITED TO JOB _____   OBEYS SHOP RULES _____

SPOILAGE RECORD _____

DO YOU CONSIDER WORKER'S PROGRESS SATISFACTORY? _____

IS THE WORKER PROMOTABLE MATERIAL? _____

COMMENTS: (Explain any rating of 2) _____

PLAINTIFF'S EXHIBIT 8-8-03

RATING SCALE: 5 IS EXCELLENT; 4 IS GOOD; 3 IS FAIR; 2 IS POOR.



- STAMPINGS
- DRAWN PARTS
- ASSEMBLIES

THE **Deerfield**
MANUFACTURING COMPANY

- TOOLS — DIES
- JIGS — FIXTURES

320 N. MASON MONTGOMERY RD. • MASON, OHIO 45040 • TELEPHONE (513) 398-2010 • FAX (513) 398-2014

January 30, 2002

Maurice Allen
3018 Woodburn Ave.
Cincinnati, Ohio 45206

Dear Maurice,

    The Deerfield Manufacturing Company has been sold, effective date is January 31, 2002. As the Company will no longer exist, all benefits will cease. Your employment will cease as of January 31, 2002. You are currently on a Worker's Compenstion Leave and receiving benefits through that program. You will have the option to pick up Health Insurance through C.O.B.R.A., that information is enclosed. Your Life and A.D.&D. Insurance will cease as of January 31, 2002. In the near future you will be receiving information through the mail concerning the Pension Plan.

    I wish you success in your future endeavors. Should you have any questions concerning C.O.B.R.A., please feel free to contact me in the Personnel Office at 513-398-2010 ext. 4119.

Sincerely,

Janet Freeman
Deerfield Manufacturing Company
Personnel Manager



PLAINTIFF'S EXHIBIT 4
8-8-03

# STATUS REPORT

CLOCK NO. **404**   NAME **Maurice Allen**   HIRED **9-30-96**   DATE ISSUED **2-4-2002**   RATE **10.61**

PRESENT CLASSIFICATION **A Operator**   REHIRED _____   RATE _____

| CHANGES: | EFFECTIVE **2-1-2002** |
|---|---|
| TRANSFER | FROM |
|  | TO |
| RECLASS | FROM |
|  | TO |
| RATE | FROM |
|  | TO |
| CLOCK NO. | FROM |
|  | TO |

| PREVIOUS RATE | | | | |
|---|---|---|---|---|
| DATE ISSUED | | | | |
| TYPE RATING | | | | |
| APPROVED | *[signature]* | | | DATE |
| FOREMAN | | | | |
| SUPT. | | | | |
| FACTORY MGR. | | | | |

COMMENTS:
1/31/02 Company Closure / p/u
Terminated.

SHIFT NO. **1st**
S.S. NO. _____
BIRTHDAY _____

no rate payment no time worked 2002

---

## WORK EVALUATION

IMPROVEMENT IN QUALITY _____          FOLLOWS INSTRUCTIONS ACCURATELY _____

INCREASE IN QUANTITY _____             ATTENTION TO JOB _____

CARE OF EQUIPMENT _____                 ATTENDANCE _____

ABILITY TO LEARN _____                   WORKS SAFELY AND NEATLY _____

PHYSICALLY SUITED TO JOB _____          OBEYS SHOP RULES _____

SPOILAGE RECORD _____

DO YOU CONSIDER WORKER'S PROGRESS SATISFACTORY? _____

IS THE WORKER PROMOTABLE MATERIAL? _____

COMMENTS: (Explain any rating of 2) _____

**PLAINTIFF'S EXHIBIT 5**
8-8-03  6

RATING SCALE: 5 IS EXCELLENT;  4 IS GOOD;  3 IS FAIR;  2 IS POOR.



**Monthly Focus:**
**Relationships—**
Who are the people
that matter most to you?

*The person whose doors I enter with most pleasure, and*
*quit with most regret, never did me the smallest favour.*
— William Hazlitt

**4**
Monday
February 2002

**Daily Record of Events**

35th Day  330 Left  Week 6

- H Allen - 2:4 (AM)
- cold received letter - yes -
- no longer employee. Sold
- anything in locker
- careful at payment [other employees]
- [unclear] to full at appointment. [unclear] employment of m. co.

© 1998 Franklin Covey Co.      www.franklincovey.com      Original—Classic



PLAINTIFF'S EXHIBIT 6   8-8-03

- STAMPINGS
- DRAWN PARTS
- ASSEMBLIES



# Deerfield
## MANUFACTURING INC.
### A SUBSIDIARY OF ICE INDUSTRIES

- TOOLS — DIES
- JIGS — FIXTURES

320 N. MASON MONTGOMERY RD. • MASON, OHIO 45040 • TELEPHONE (513) 398-2010 • FAX (513) 398-2014

March 12, 2002

Cincinnati Area Office
Attn: Helen B. Glutz, Cart Team Leader
550 Main Street, Suite 10-019
Cincinnati, Ohio 45202-5202

Re:   Allen, Maurice B.
      Charge No. 221A200353

Dear Helen B. Glutz,

Mr. Maurice Allen was an employee of Deerfield Manufacturing Company and was on leave due to a Worker's Compensation Lost Time Injury. Deerfield Manufacturing Company was sold effective January 31, 2002. New ownership, Deerfield Manufacturing Incorporated a subsidiary of Ice Industries did view those employees who were actively working for Deerfield Manufacturing Company. Mr. Allen was not an actively working employee. Actively working employees did include Black and other Minorities, all were hired by Deerfield Manaufacturing Incorporated. I have attached a letter that was sent to Mr. Allen by the previous owner, Deerfield Manufacturing Company, terminating his employment.

On February 4, 2002 Mr. Maurice Allen did enter the Deerfield Manufacturing Incorporated plant located at 320 N. Mason Montgomery Rd. in Mason Ohio. I was in the manufacturing area when he entered. I asked Mr. Allen why he was at the plant and he stated he came to work for the new company. I then asked if he had received the letter sent to him by the previous company, Deerfield Manufacturing Company, terminating his employment and he stated he did and thought he was to start with the new company. He stated he came to fill out his paperwork like the other employees. All actively working employees of the previous company, Deerfield Manufacturing Company, filled out an application for employment. I advised Mr. Allen he could fill out an application for employment. Mr. Allen then left the premises. As of date, we have not received an application from Mr. Maurice Allen.

Sincerely,

Janet Freeman
Human Resource Manager

PLAINTIFF'S EXHIBIT

# ICE INDUSTRIES
## DEERFIELD MFG. DIVISION

## APPLICATION FOR EMPLOYMENT

DATE 2-4-02

Ice Industries is an Equal Opportunity Employer and abides by local, state, and Federal laws in regard to discrimination because of age, sex, race, National origin, creed, religion or physical handicap: and is a covered organization under the Drugfree Workplace Act of 1988.

Name  ROTH            KARL            ROGER          Soc. No. 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
       (Last)          (First)         (Middle)

Address  62 BRITTANY LANE    FAIRFIELD    OH    45014
         (Street)            (City)      (State) (Zip)

Phone numbers where you can be reached or message left: Home 942-0982   Other 874-5923 mother

Who referred you to this company? Previously work for Deerfield  Are you at least 18 years old? Yes

Are you able to work any shift  ✓ yes  ___ no  Explain if no. Preferred 1ST will take 2nd

Position desired: Blankline 1ST, OR ANY

Highest grade completed   1 2 3 4 5 6 7 8 9 10 11 (12)     College  1 2 3 4

Special Training  Die setter class, Towmotor class, Inspection class, Crane operating class

Special Skills (including machinery  Punch press, Towmotor driver, Blankline operator, Wrapper, Shipping & Recieving, Diesetter, operate Crane

### PREVIOUS WORK EXPERIENCE

| Employer | Mo/Yr From | Mo/Yr To | Job Title | Begin Rate | Ending Rate | Reason for Leaving |
|---|---|---|---|---|---|---|
| Name: Conner + Murphy  Address & Phone: 1 Westwood Dr  (513) 942-1153 | 6/8/02 | 11/02 | Maint Tech | 10.50 | 10.50 | Not enough income |
| Name: Deerfield MFG  Address & Phone: | 11-93 | 6/02 | Blankline Op. | ? | 10.79 | other opportunity |
| Name:  Address & Phone: | | | | | | |
| Name:  Address & Phone: | | | | | | |

PLAINTIFF'S EXHIBIT 8  8-8-03

(OVER)

Branch of Military ___N/A___ National Guard ___N/A___ Date of Obligation ends _____

Do you have any restrictions preventing you from standing eight hours or lifting five to twenty pounds? ___ Yes ___ No

If you answered Yes above please specify.

_____

If you are presently working may we contact your current employer? ___Yes___ Have you worked for Deerfield before? ___Yes___

Dates Worked __11/93 – 6/02__ Reason for leaving __other opportunities__

Relatives in Company Employ _____

Notify in case of emergency __Jackie Roth__ phone __874-5923__ relationship __mother__

Have you ever been convicted of a Felony? ___yes_/_no___ If yes give details. _____

Note: A criminal record does not in itself bar a person from employment consideration.

Do you have a valid Driver's License for this state? _/yes___ no Type _____ License Number __RF312605__

Are you willing to take a Physical Exam and drug test? _/yes___ no

---

List two References who are not relatives.

| Name | Address | Occupation | Years known |
|---|---|---|---|
| Brad Rosenburg | | Pastor | 1 yr |
| Jack Woods | | Photographer | 2 yr |

---

Applicants offered and accepting employment will be conditionally hired until such person provides the necessary documentation in compliance with the Immigration Reform Act.

I certify the foregoing statements are accurate and complete to the best of my knowledge and understand that I am subject to dismissal if any information provided by me is false.

I hereby give Ice Industries permission to contact schools, previous employers, and others with whom I am acquainted, and hereby release both Ice Industries and any persons or institutions so contacted from any liability which might grow out of any information furnished as a result of such contact.

I further understand that my employment is contingent upon passing a post-offer physical examination.

Date you could start: __2/4/02__

DATE: __1/28/02__    SIGNATURE __Karl Rager__