# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MAURICE B. ALLEN,

      Plaintiff,

      vs.

DEERFIELD MANUFACTURING
INCORPORATED, A SUBSIDIARY
OF ICE INDUSTRIES,

      Defendant.

Civil Action No. 1:02-cv-492

**REPORT AND
RECOMMENDATION**
(Spiegel, J.; Hogan, M.J.)

Plaintiff Maurice B. Allen brings this action against defendant Deerfield Manufacturing Inc. ("Deerfield Inc."), a subsidiary of Ice Industries, alleging that defendant discriminated against him on the basis of his race in violation of 42 U.S.C. § 2000e-2, 42 U.S.C. § 1981, Ohio Rev. Code § 4112.02(A), and Ohio Rev. Code § 4112.99; that defendant discriminated against him on the basis of a disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, Ohio Rev. Code § 4112.02(A), and Ohio Rev. Code § 4112.99; and that defendant violated Ohio's public policy stated in Ohio Rev. Code § 4123.90 by refusing to rehire plaintiff because of his prior work-related injury and subsequent Workers' Compensation claim. This matter is before the Court on defendant's motion for summary judgment (Doc. 19), defendant's proposed findings of fact and conclusions of law (Doc. 20), the Affidavit of Janet Freeman in support of defendant's motion for summary judgment (Doc. 23), plaintiff's memorandum in opposition to the motion for summary judgment and appendix in support thereof (Docs. 28, 30), and defendant's reply memorandum in support of its motion for summary judgment. (Doc. 34.)  This matter is also before the Court on defendant's motion to strike (Doc. 35), plaintiff's memorandum in opposition to the motion to strike (Doc. 38), and defendant's

reply memorandum in support of the motion to strike. (Doc. 41).

## FACTS

Plaintiff, an African American, was employed by Deerfield Manufacturing Company (Deerfield Company) from September 1996 until January 31, 2002.  In his employ with Deerfield Company, plaintiff worked as an operator and forklift driver.  Deerfield Company is not a party to this lawsuit.

On August 15, 2001, plaintiff was injured in an accident that occurred in the parking lot at Deerfield Company.  A truck backed into plaintiff's car, injuring plaintiff's wrist, neck and back.  Plaintiff was unable to perform his job as a forklift driver and applied for Workers' Compensation benefits.  Deerfield Company contested the claim on the basis that the injury was not work-related. Although plaintiff's claim was initially denied, plaintiff was granted Workers' Compensation benefits after an appeal.  On November 2, 2001, plaintiff underwent surgery on his wrist.  Plaintiff was on leave for his Workers' Compensation injury from August 2001 until February 4, 2002, when he was released by his doctor to return to work.

Deerfield Company ceased doing business on January 31, 2002.  The assets of Deerfield Company were sold to Deerfield Inc. which began business on February 1, 2002.  Janet Freeman, the Human Resources Manager at Deerfield Company and subsequently Deerfield Inc., avers that in December 2001, she was advised to cooperate and provide assistance to Deerfield Inc., the prospective future owner of Deerfield Company's assets.  Freeman states that while Deerfield Inc. was not required to retain any of the employees from Deerfield Company, it was hoped that many of Deerfield Company's employees would be hired by Deerfield Inc.  In an effort to assist the new prospective owner, Deerfield Inc., Freeman and Dave Randall, another

2

Deerfield Company employee, evaluated the "active" employees of Deerfield Company in December 2001 and January 2002 for possible employment with the new company.  All of the Deerfield Company employees who were laid off in November 2001 were called back to work as active employees of Deerfield Company in January 2002 and were considered for employment with Deerfield Inc.  To be considered for employment with the new company, employees of Deerfield Company had to be actively working, submit an application for employment with the new company, and be able to begin working on February 1, 2002 with the new company.  Applications for employment with the new company were available on a table outside of the human resource department in January and February, 2002.

During the evaluation period of December 2001 and January 2002, Freeman would walk the plant floor at various intervals to evaluate the active employees of Deerfield Company.  All Deerfield Company employees who were not actively working during the evaluation period were not considered for employment with Deerfield Inc. prior to the start up of the new company.  No employee on sick leave or Workers' Compensation leave was considered for employment.  Initially, those individuals included plaintiff Maurice Allen, an African American male, and Earl Baker and Jacky Collett, Caucasian males.  Plaintiff was on a Workers' Compensation leave of absence during the time frame that evaluations and decisions were being made regarding the hiring of the active employees of Deerfield Company for employment with Deerfield Inc., the new company.  Earl Baker, who was on a Workers' Compensation leave longer than plaintiff, returned to active employee status with Deerfield Company in mid-January, 2002 during the evaluation period and was evaluated for employment with Deerfield Inc.  Plaintiff Allen and Jacky Collett never returned to work as active employees of Deerfield Company during the December and January evaluation period and therefore were not evaluated for employment along

with the other Deerfield Company employees.

Many of the active Deerfield Company employees were not hired by the new company, Deerfield Inc.  For example, a Caucasian male was not hired due to the work ethic he displayed during the evaluation period.  In addition, employees with attendance problems were not hired by Deerfield Inc.  All of the non-Caucasian active employees of Deerfield Company were hired by Deerfield Inc., while the active employees of Deerfield Company who were not hired by Deerfield Inc. were all Caucasians.

On about January 22, 2002, while plaintiff was still on Workers' Compensation leave, he happened to see Venita Watson, a coworker from Deerfield Company at a local store.  Watson told plaintiff that Deerfield Company had been sold and that all employees were in the process of filling out applications for Deerfield Inc., the new employer.  Watson advised plaintiff there was a deadline to fill out an application and offered to bring him a new hire packet.

The following day plaintiff attempted to contact Human Resources Manager Freeman.  Plaintiff and Freeman spoke on January 24, 2002.  Plaintiff told Freeman that he was aware of the sale and inquired about the deadline to submit an application for the new owner.  Plaintiff confirmed that Ms. Freeman had received his most recent doctor's note releasing plaintiff for a return to work on February 4, 2002.  Ms. Freeman told plaintiff that there was no need to fill out an application because he had not yet been released to return to work.  Ms. Freeman avers that based on her prior experience with plaintiff, there was some concern on her part whether he would actually be able to work on February 4, 2002.  Freeman avers that there were instances in the past where plaintiff would submit doctor's slips indicating a return to work on a certain day only to have the absence extended beyond that date.  Freeman told Plaintiff that he could fill out an application on February 4, 2002 when his doctor released him to work.  Plaintiff understood

4

that "all employees had to put in new applications in order to work for the new company." (Allen Depo. at 42).

On January 30, 2002, Freeman sent plaintiff a certified letter advising him that his employment with Deerfield Company ended as of midnight on January 31, 2002 upon the sale of the company to Deerfield Inc.  Plaintiff did not believe the letter had any effect on his prospective employment with Deerfield Inc., the new owner.  On February 1, 2002, defendant Deerfield Inc. purchased the assets of Deerfield Company and began business.

On the morning of February 4, 2002, plaintiff arrived at Deerfield Inc. and entered the plant through the employee entrance.  Plaintiff avers he went with the intention of filling out an employment application for Deerfield Inc.  Plaintiff states:

> Since I had been an employee in the past, I parked in the employee lot and entered through the employee door.  Ms. Freeman was waiting in the lobby near the time clock.  She asked me if I received her letter.  I told [her] that I had.  She told me I was not supposed to be in the plant.  I told her that I was there to fill out a new hire packet.  She told me that the new owner decided not to hire me and that I had to leave the premises.  When I asked why I was not being hired, Ms. Freeman said she did not know, and that it was the new owner's decision.  I told Ms. Freeman that I needed to get my boots which had been left in the locker room since my injury in August of 2001.  She escorted me to the locker room.  Ms. Freeman never said anything about filling out an application on February 4, 2002 or indicated that I could do so.  As I left the building, Ms. Freeman said "Good luck in whatever you do" and told me that I could go to the unemployment office and file for benefits.
>
> I left Deerfield and immediately went to the Equal Employment Opportunity Commission to see about filing a discrimination charge.  I also went to the unemployment office that day and filed my application for unemployment benefits.  To my knowledge, neither Deerfield Co. nor Deerfield Inc. ever opposed the claim on the basis that I rejected available work or that I was unemployed through my own fault by failing to submit an application.

(Doc. 30, App. A, Plaintiff Aff. ¶¶10-11).

Ms. Freeman's version of the events are as follows:

On February 4, 2002, I was in the plant when I noticed Mr. Allen walking into the plant through the employee entrance. I was near the time clock because it was a new system and I was making sure that everything ran smoothly when the employees clocked in that morning. I was not in the plant area because I was waiting for Mr. Allen. I approached Mr. Allen, as I would any non-employee of Deerfield Inc., and indicated to him that he was not suppose to be there. I stated to him that he had not been hired by the new owner and that he would have to leave. I told him that he could fill out an application and I pointed to the front of the building where the applications were located on the table. Based upon his deposition testimony, it appears as though Mr. Allen misunderstood my statement that "he had not been hired by the new owner" to mean that the new owner had actually considered him for employment and had declined. To the contrary, Mr. Allen was never considered for employment because he was not an active employee of Deerfield Company during the evaluation period and he failed to submit an application for employment. It can be very noisy in the plant and it is very unfortunate if he misunderstood my statement.

I never prevented Mr. Allen from submitting an application for employment. In fact, on January 24, 2002, I specifically told him to submit his application on February 4, 2002. His presence in the Deerfield Inc. plant by walking through the employee entrance came as a complete shock to me. He was not supposed to be in the plant and my job was to get him out of there. As the Human Resource Manager, I could not allow non-employees to walk around the plant freely. He explained he needed to get some of his personal belongings and I allowed him to retrieve those before escorting him out of the building. I never indicated that he should go down to unemployment.

When he left, I wasn't exactly sure what his plans were, so I wished him well in everything that he did. I was unaware that he had misunderstood my comment about not being hired and that he should therefore not apply for a position especially since I had told him previously that he could fill out his application on February 4, 2002.

(Doc. 23, Freeman Aff. ¶¶11-13).

Ms. Freeman was aware that plaintiff was available to start working February 4, 2002 without restrictions and had inquired about filling out an application for the new company. There was a shortage of operators and Deerfield Inc. had placed advertisements for employees in the newspaper. On February 4, 2002, defendant hired at Karl Roth and Carrie Nelson Gibson to work as second shift operators. Both Roth and Gibson are Caucasian. Mr. Roth and Ms. Gibson

6

had previously worked for Deerfield Company, had left on good terms, and had applied for a position with Deerfield Inc.  Plaintiff had performed the operator position in the past.  As of February 4, 2002, plaintiff was not disabled and was capable of performing his job one hundred percent.

Plaintiff's last job at Deerfield Company was operating a fork lift for the 73 line. Deerfield Inc. was not operating the 73 line in February 2002 and no fork lift operator was needed for that line.

Within 90 days of February 4, 2002, plaintiff never provided a written notice to defendant that he considered defendant's conduct to be in violation of Ohio Rev. Code § 4123.90.

Plaintiff did not submit an application for employment with Deerfield Inc. prior to the filing of this lawsuit.

## II.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S RACE DISCRIMINATION CLAIMS UNDER 42 U.S.C. § 2000e-2, 42 U.S.C. § 1981, OHIO REVISED CODE § 4112.02(A), AND OHIO REVISED CODE § 4112.99 SHOULD BE GRANTED.

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56.  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.

A party may move for summary judgment on the basis that the opposing party will not be

7

able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law. In response to a summary judgment motion properly supported by evidence, the non-moving party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989). Conclusory allegations, however, are not sufficient to defeat a properly supported summary judgment motion. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990). The non-moving party must designate those portions of the record with enough specificity that the Court can readily identify those facts upon which the non-moving party relies. *Karnes v. Runyon*, 912 F. Supp. 280, 283 (S.D. Ohio 1995)(Spiegel, J.). "[A]fter a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting [one's own] earlier deposition testimony." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1352 (6th Cir. 1991).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. In so doing, the trial court does not have a duty to search the entire record to establish that there is no material issue of fact. *Karnes*, 912 F. Supp. at 283. *See also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 249-50.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a *prima facie* case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

As an initial matter, defendant Deerfield Inc. seeks summary judgment on plaintiff's failure to "rehire" claims because plaintiff was never employed by defendant Deerfield Inc., but rather by defendant's predecessor company Deerfield Company. Defendant Deerfield Inc. also contends it was not required to hire any of the former employees of Deerfield Company. As defendant points out in its memorandum, under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, a successor employer is free to refuse to hire any or all of the employees of the predecessor company except in the case of certain mergers and alter ego transactions. *See Bean v. United Rubber, Cork, Linoleum and Plastic Workers of America*, 861 F. Supp. 1554, 1569 (N.D. Ala. 1994), citing *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 261 (1974). Plaintiff does not dispute that defendant was under no obligation to "rehire" him as a matter of federal labor law. Rather, he contends that defendant treated him differently than former Caucasian employees of Deerfield Company in violation of federal employment discrimination laws. In the context of the entire amended complaint, it is clear that plaintiff's claims concern defendant's failure to "hire" him for a job notwithstanding his use of the term "rehire" in certain instances in the amended complaint. Therefore, the Court should decline to grant summary judgment for defendant on this basis.

Plaintiff claims he was discriminated against on the basis of his race, African American, in violation of 42 U.S.C. § 2000e-2, 42 U.S.C. § 1981, Ohio Rev. Code § 4112.02(A), and Ohio Rev. Code § 4112.99. Title VII makes it unlawful for an employer to refuse to hire an individual or to otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race. 42 U.S.C. § 2000e-

2(a)(1).  The standards for establishing a discrimination claim under Title VII are equally applicable to plaintiff's claims under 42 U.S.C. § 1981 and Ohio Rev. Code § 4112.  *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992).  Plaintiff may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, *Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1166 (6th Cir. 1996); *Terbovitz v. Fiscal Court*, 825 F.2d 111, 114-15 (6th Cir. 1987)(citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)), or by showing the existence of circumstantial evidence which creates an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See also Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).  Plaintiff may establish a *prima facie* case of race discrimination by showing:  (1) he is a member of a racial minority; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, he was replaced by a person outside the protected class, or after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *McDonnell Douglas Corp.*, 411 U.S. at 802;  *Thurman,* 90 F.3d at 1166.  Such proof "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The employer is entitled to judgment if the plaintiff does not establish a *prima facie* case. *Mitchell*, 964 F.2d at 582-84.

Once plaintiff has presented evidence sufficient to establish a *prima facie* case of discrimination, the burden of production shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Burdine,* 450 U.S. at 253; *McDonnell*

*Douglas Corp.*, 411 U.S. at 802.  If defendant meets this burden, the burden of production shifts back to plaintiff to demonstrate that defendant's articulated reason is merely a pretext for unlawful discrimination. *Burdine,* 450 U.S. at 253; *McDonnell Douglas Corp.*, 411 U.S. at 804. In other words, plaintiff must show that the proffered explanation is unworthy of credence or that defendant was more likely motivated by a discriminatory reason. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994).  There must be "a sufficient basis *in the evidence*" for rejecting an employer's stated explanation for its action. *Manzer*, 29 F.3d at 1083 (emphasis in the original).  *See also Gray v. Toshiba America Consumer Products*, 263 F.3d 595, 600  (6th Cir. 2001).  Summary judgment in favor of defendant is appropriate where plaintiff is unable to demonstrate pretext sufficient to rebut defendant's legitimate, non-discriminatory reasons.  *Barnhart v. Peckrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1395 (6th Cir. 1993). "The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination *and* that the employer intended to discriminate on the basis of race." *Thurman*, 90 F.3d at 1166 (emphasis in the original), citing *St. Mary's Honor Center*, 509 U.S. at 113.

 In the present case, plaintiff presents no direct evidence of intentional discrimination on the part of defendant.  With respect to the circumstantial showing of discrimination, it is undisputed that plaintiff is African American and a member of the protected class.  Plaintiff also presents evidence that he was qualified for the available operator positions as he had performed this position at Deerfield Company in the past for several years.  It is undisputed that defendant Deerfield Inc. hired two Caucasians, Karl Roth and Carrie Nelson Gibson, for the available operator positions.  With regard to the final element of plaintiff's *prima facie* case, that he applied for a job with defendant, it is undisputed that plaintiff did not file an application for

11

employment with defendant.  Nevertheless, plaintiff argues that he was denied the opportunity to apply for any of the available jobs with defendant and, under such circumstances, the application requirement is satisfied.  For the reasons that follow, the Court finds plaintiff fails to satisfy the application requirement of his *prima facie* case.

Plaintiff's *prima facie* case of discrimination includes the requirement that he applied for the job for which Deerfield Inc. was seeking applicants. *McDonnell Douglas*, 411 U.S. at 802. The purpose of the application element is to eliminate a common non-discriminatory reason for rejecting a job applicant: his failure to apply. *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133 (11th Cir. 1984).  The Sixth Circuit has recognized, however, that in limited circumstances a plaintiff may maintain a failure-to-hire claim under Title VII without formally applying for the position.  *See Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145 (6th Cir. 1989).  For example, where the employer creates an atmosphere under which prospective applicants understand a formal application would be futile because discrimination is entrenched or pervasive, the formal application requirement may be relaxed. *Wanger*, 872 F.2d at 145, citing *Babrocky v. Jewel Food Co. and Retail Meatcutters Union, Local 320*, 773 F.2d 857 (7th Cir. 1985) (employer created atmosphere where female employees understood applying for certain positions would be fruitless).  *See also International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 367-68 (1977) ("A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection"; employee need not apply where discriminatory practices of employer "had been so successful as totally to deter job applications from members of minority groups").  This exception requires a showing of a pervasive, consistent, and continuing pattern or practice of discrimination in order to excuse an applicant from formally

12

applying for the position. *Teamsters*, 431 U.S. at 365-68.  Here, plaintiff has not shown such a pattern or practice of discrimination at Deerfield Inc. such that submitting a formal application would be futile.  In fact, it is undisputed that all former non-Caucasian employees of Deerfield Company who applied for employment with Deerfield Inc. were hired by the new company. Therefore, plaintiff cannot meet his *prima facie* case under this theory.

The *Wanger* Court also recognized that a formal application may not be required where the employer has a practice of hiring without asking for applications or posting the opening. 872 F.2d at 146, citing *Box v. A & P Tea Co.,* 772 F.2d 1372, 1376 (7th Cir. 1985), *cert. denied*, 478 U.S. 1010 (1986).  Under this situation, the plaintiff may establish the application element of his *prima facie* case by showing that he would have applied for the position had he known of the opening. *Id.*  In such a case, "[i]n order for the employee to establish that he or she would have applied for the position if they had been aware of it . . . the employee must establish that [he or] she had shown more than a mere general interest in the position." *Id.*

In the instant case, it is clear that defendant Deerfield Inc. did not have a policy of hiring without publicizing the position or requiring a formal application.  Plaintiff testified he knew all Deerfield Company employees were required to submit applications to be considered for employment with Deerfield Inc. and that he specifically spoke with Ms. Freeman about this requirement.  Therefore, this exception simply does not apply in the instant case to establish plaintiff's *prima facie* case.

Plaintiff cites *Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000) in support of his claim that he was denied the opportunity to apply for any of the available jobs with Deerfield Inc.  In *Dews*, the Court held "that in failure to promote cases a plaintiff does not have to establish that he applied for and was considered for the promotion *when the employer does not*

*notify its employees of the available promotion* or does *not provide a formal mechanism* for expressing interest in the promotion. Instead, the company is held to a duty to consider all those who might reasonably be interested in a promotion were its availability made generally known." 231 F.3d at 1022 (Emphasis added).  The exception to the application requirement in *Dews* was aimed at  addressing the unfairness associated with the failure to notify potential candidates of a position through a formal posting or some other means.  In other words, it is unfair to require an employee to apply for a job about which he has no knowledge.  The instant case, unlike *Dews*, is not a failure to promote case.  Nor does the *Dews'* rationale apply in this case.  Unlike the plaintiff in *Dews*, it is undisputed that plaintiff Allen was in fact aware of the employment opportunities with Deerfield Inc., that Deerfield Inc. had a formal application process, and that "all employees [of Deerfield Company] had to put in new applications in order to work for the new company." (Allen Depo. at 42).  Plaintiff did not lack notice of the available positions and *Dews* does not excuse plaintiff's failure to submit an application in this case.

Plaintiff has not cited and this Court has not found any other cases which would relax the application requirement of *McDonnell Douglas*.  Nevertheless, plaintiff argues that he wanted to submit an application but was denied the opportunity to do so.  Plaintiff states he was "specifically told" not to fill out an application until February 4, 2002.  He claims that when he followed this instruction and arrived at the plant on February 4 he was allegedly told by Freeman that the new owner decided not to hire him, to leave the plant, and to apply for unemployment benefits. (Doc. 28 at 6).

Contrary to plaintiff's argument, there is no evidence that Ms. Freeman prohibited plaintiff from filling out an application either prior or subsequent to February 4.  The evidence does not show Ms. Freeman "specifically told" plaintiff not to complete an application until

14

February 4. Rather, in response to plaintiff's inquiry about an application deadline that did not apply to him as a non-active Deerfield Company employee, Ms. Freeman told plaintiff he did not "have to put [his] application in" on January 24, the date of their telephone conversation, but could "wait until February 4th when the doctor releases [him] to put [his] application in." (Allen Depo. at 108; 42). Defendant admits that Freeman told plaintiff the new owner had not hired him, but such statement merely reflected the reality that plaintiff had not yet submitted an application to be considered for employment with Deerfield Inc. in the first instance. The fact that plaintiff was asked to leave an employee-only area of the plant when he was not an employee of Deerfield Inc. does not imply that it was futile for him to file an application for employment. Plaintiff would have the Court ignore the evidence that every other person hired by Deerfield Inc., whether a former Deerfield Company employee or not, was required to submit a formal application to be considered for employment. To except plaintiff from the application requirement under such circumstances would allow the exception to swallow the rule. As the Sixth Circuit has recognized, "if an application were not necessary, then nearly every decision to hire or promote would be subject to challenge." *Wanger*, 872 F.2d at 147, citation omitted. Plaintiff has not shown that it was futile for him to apply for the position. Because plaintiff did not apply for the position, he fails to establish a *prima facie* case of race discrimination.

Even if the Court were to permit an exception to the application requirement in this case, plaintiff nevertheless fails to carry his burden of persuasion that defendant's articulated reason for not hiring plaintiff was a pretext for discrimination.

Defendant has articulated a legitimate, nondiscriminatory reason for not hiring plaintiff, *i.e.*, he never applied for a job with Deerfield Inc. Plaintiff contends that defendant's proffered explanation is pretextual and lacks an overriding business justification. Plaintiff argues that

15

defendant's stated reason is "incredible" and has "no basis in fact" (Doc. 28 at 15); that defendant has presented inconsistent reasons for refusing to hire plaintiff; and that defendant's stated explanation is unreasonable.   The Court disagrees and, as explained below, finds plaintiff's evidence fails to raise an inference of discriminatory intent or create an issue for the jury on pretext.

To satisfy his burden on the issue of pretext, plaintiff must show that defendant's proffered reason: (1) had no basis in fact; (2) did not actually motivate defendant's hiring decision, or (3) was insufficient to motivate that decision. *Manzer*, 29 F.3d at 1084.  As to the first basis, the plaintiff must produce evidence showing that the reason given by the employer simply did not happen, *i.e.*, the reason is factually false. *Id*.  As to the second basis, more than "the bare bone elements of plaintiff's *prima facie* case" is required. *Id*.  Under these circumstances:

> [T]he plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate [the hiring decision]. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup.

*Id*. (emphasis in the original).   "[I]n order to make this type of rebuttal showing, the plaintiff may not rely simply upon his *prima facie* evidence but must, instead, introduce additional evidence of . . . discrimination." *Id*.  As to the third basis, plaintiff must produce evidence showing that he was treated differently than similarly situated employees, particularly employees not in the protected class. *Id*.  *See also Gray*, 263 F.3d at 600-602.

Plaintiff fails to establish pretext under the first *Manzer* prong, that defendant's proffered

reason had no basis in fact. 29 F.3d at 1084. Defendant's proffered reason is not factually false. Plaintiff has not produced any evidence that he in fact submitted an application for employment with defendant Deerfield Inc.

Nor does plaintiff show pretext under the third prong of *Manzer*. Plaintiff has not demonstrated that his failure to apply for a position with Deerfield Inc. was insufficient to motivate defendant's decision not to hire him. 29 F.3d at 1084. A showing that an employer's stated reasons are insufficient to motivate its actions ordinarily "consists of evidence that other employees, particularly employees not in the protected class" were not adversely treated despite "substantially identical conduct." *Id.* Here, it is undisputed that all the existing employees of Deerfield Company who desired a position with the new company were required to submit an application for employment. Likewise, Mr. Roth and Ms. Gibson, the former Deerfield Company employees who were ultimately hired for the operator positions, submitted applications for employment with Deerfield Inc. Plaintiff has not produced any evidence showing that any Caucasian employee was hired without fulfilling the application requirement.

To the extent plaintiff contends that the proffered reason did not actually motivate defendant's hiring decision, the second *Manzer* prong, plaintiff has not produced circumstantial evidence showing that it is "more likely than not" that defendant's explanation is a pretext for race discrimination. *Id.* Plaintiff points to the circumstances leading up to and including his encounter with Ms. Freeman on February 4, 2002 as evidence that defendant's stated reason for not hiring him is a pretext for discrimination: the January 24, 2002 telephone call to Ms. Freeman advising her of his desire to apply for employment with the new company and inquiring about the application deadline; Freeman's statement to fill out an application on February 4,

17

2002; his travel to the facility on February 4, 2002 for the purpose of completing an application; Freeman's alleged statement that the new employer decided not to hire him; Freeman's request that plaintiff leave the premises; the availability of jobs at Deerfield Inc.; and the placement of advertisements for such jobs in the newspaper.   Plaintiff contends that "it is incredible to believe that having made the trip to [defendant's] facility to fill out an application, Plaintiff would have left without doing so unless he was denied the opportunity." (Doc. 28 at 15).

     Arguably the strongest piece of evidence plaintiff presents in support of pretext is his recollection of Ms. Freeman's statement to him during their encounter in the plant on February 4, 2002.  Plaintiff states that Ms. Freeman told him "the new owner decided not to hire [him]" implying that a hiring decision had been made despite the fact that plaintiff never applied for a job with Deerfield Inc.  Ms. Freeman, on the other hand, states she told plaintiff "he had not been hired by the new owner" meaning he was never considered for employment because he was not an "active" Deerfield Company employee during the evaluation period and had never submitted an application. The subtle variation in these two statements can certainly explain the parties' differing positions in this matter.  Plaintiff's version, in isolation, could  suggest a hiring decision had been made despite plaintiff's failure to apply for employment.  Yet, in the context of all the other evidence presented in this matter, plaintiff's version of Freeman's statement does not imply that the decision was racially motivated and does not in itself create a material issue of fact on the question of pretext.

     First, it is undisputed that Deerfield Inc. required a formal application from all potential employees to be considered for employment.  The existing employees of Deerfield Company who were "actively" working had to submit an application for employment with Deerfield Inc.

and be able to begin working on February 1, 2002 to receive preferential consideration for employment with the new company.  It is undisputed that plaintiff was not in the group of "active" Deerfield Company employees as a result of his Workers' Compensation leave and was therefore was ineligible for a pre-employment evaluation in advance of the start up of the new company on February 1, 2002.  Plaintiff admits he was aware of that all former Deerfield Company employees were required to submit a formal application before they could be considered for employment with Deerfield Inc.  It is also undisputed that every former Deerfield Company employee who was ultimately hired by Deerfield Inc. submitted an application for employment with the new company.  There is no evidence that any former Deerfield Company employee was ever considered for employment with Deerfield Inc. without filing an application.

Second, while plaintiff makes much of the "fact" he was "specifically told not to fill out [an application] until February 4, 2002" (Doc. 28 at 6), his deposition testimony reflects that what he was actually told was he need not submit an application in advance of February 4, the date his doctor released him for work, because the "deadline" for applications only applied to "active" Deerfield Company employees who desired preferential consideration for employment prior to the start up of the new company on February 1, 2002.  Because his doctor did not clear him for work prior to the start up of the new company on February 1, plaintiff could not qualify as an "active" Deerfield Company employee who would be eligible for early consideration for employment with Deerfield Inc.  Under the circumstances, the suggestion that plaintiff wait until February 4 to complete an application was certainly a reasonable response to a potential applicant inquiring about application deadlines that did not apply to him.

Third, the fact that Ms. Freeman told plaintiff to leave the defendant's facility on

February 4, 2002 does not imply the decision not to hire plaintiff was racially motivated. Plaintiff does not dispute that he was formally notified by certified mail that his employment with Deerfield Company ended as of midnight on January 31, 2002. Despite the fact he was not a Deerfield Inc. employee on February 4, 2002, plaintiff made no attempt to fill out an application in the area where the applications were available to the public, but rather entered the facility by the employee entrance. The fact that Ms. Freeman asked plaintiff, a non-employee, to leave an employee-only area of defendant's facility on February 4 was not unreasonable.

Fourth, plaintiff presents no evidence whatsoever showing race played a part in employment decisions at Deerfield Inc. To the contrary, all of the non-Caucasian active employees of Deerfield Company were hired by Deerfield Inc. The only active employees of Deerfield Company who were not hired by Deerfield Inc. were Caucasians.

Opposing the undisputed evidence showing the established procedure for evaluating and hiring former Deerfield Company employees for the new company, including the submission of a formal application by each employee ultimately hired, is plaintiff's claim that he did not apply because he was told the new owner "decided" not to hire him. This evidence alone fails to create a jury question on whether it is "more likely than not" that plaintiff's failure to submit an application for employment with defendant is a pretext for race discrimination. This Court has a duty to review all of the facts together, not in isolation, in determining whether plaintiff has presented sufficient evidence showing defendant's proffered reason was a pretext for intentional discrimination. *Thurman*, 90 F.3d at 1166. When viewed in the context of all the other evidence surrounding the employment evaluation process for "active" Deerfield Company employees and the established hiring practices of Deerfield Inc., plaintiff's evidence is insufficient to create a

material issue of fact concerning the legitimacy of defendant's articulated reason for not hiring plaintiff. *Manzer*, 29 F.3d at 1083. The record in this matter, taken as a whole, could not lead a rational trier of fact to find for plaintiff on the issue of pretext. *Matsushita*, 475 U.S. at 587. The ultimate burden of persuasion is on plaintiff to show that defendant intentionally discriminated against him on the basis of his race. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000). Plaintiff has simply failed to present evidence that would support such a conclusion and, therefore, fails to carry his burden of proof on the issue of pretext. Accordingly, defendant's motion for summary judgment on plaintiff's Title VII, Section 1981, and Ohio Rev. Code § 4112.02 should be granted.


## III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S DISABILITY DISCRIMINATION CLAIMS SHOULD BE GRANTED.

Plaintiff claims he was discriminated against on the basis of a disability by defendant Deerfield Inc. in violation of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101, and Ohio Rev. Code § 4112.02(A). The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Ohio similarly precludes disability discrimination in employment. Ohio Rev. Code § 4112.02(A). Since plaintiff's ADA and state law claims require the same essential elements, the Court may consider them simultaneously. *Rosso v. A.I. Root Co.,* 97 Fed. Appx. 517, 521 (6th Cir.), *cert. denied*, 125 S.Ct. 617 (2004). The *McDonnell Douglas* burden-shifting framework utilized in other employment discrimination cases also applies in employment discrimination cases based on disability. *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 882 (6th Cir. 1996).

To make out a prima facie employment discrimination case under the ADA, plaintiff must show (1) that he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation, and (3) who was discriminated against solely because of the disability. *See Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002); *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996). In determining whether an individual is disabled, an individualized inquiry must be made. *Cotter v. Ajilon Servs., Inc.,* 287 F.3d 593, 598 (6th Cir. 2002), citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483 (1999). An individual is considered "disabled" under the ADA if he: (A) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) [has] a record of such an impairment; or (C) [is] regarded as having such an impairment. 42 U.S.C. § 12102(2). *See also* Ohio Rev. Code § 4112.01(A)(13) (same).

In the instant case, plaintiff argues he is "disabled" under the ADA and Ohio law because he has a record of an impairment and was regarded as disabled by defendant. For the reasons that follow, the Court finds plaintiff fails to establish he is disabled under either prong of the disability definition and therefore fails to make a *prima facie* showing of disability discrimination.

First, plaintiff fails to establish he has a record of an impairment that substantially limits one or more of the major life activities. "A record of an impairment means an individual has 'a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002), quoting 28 C.F.R. § 35.104(3). As explained in the Interpretive Guidance

on Title I of the Americans with Disabilities Act set forth in the federal regulations:

> The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability. For example, this provision protects former cancer patients from discrimination based on their prior medical history. . . . This part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities. . .

29 C.F.R. Pt. 1630, App. § 1630.2(k)(2005).  Thus, ADA claims based on a record of impairment require a showing of a mental or physical impairment that substantially limits one or more major life activities.  *See Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1229 (11th Cir. 1999); *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 645 (2nd Cir. 1998).

Federal regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).  The regulations set forth the following factors to be considered in determining whether an individual is "substantially limited" in a major life activity:

> (i) The nature and severity of the [plaintiff's] impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).  The Supreme Court has stated that the terms "substantially limits" and "major life activity" must be "interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 197 (2002).  Any impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA. *Mahon,* 295 F.3d at 590-91.

23

Plaintiff argues that he had a record of disability because he was out of work for nearly six months due to an approved Workers' Compensation injury and defendant would not consider him for work due to his impairment.  Conspicuously absent from plaintiff's brief on this issue is his identification of the impairment or impairments which he believes substantially limited his ability to engage in a major life activity and his identification of the major life activity he believes was allegedly affected thereby.  To the extent plaintiff may claim he was substantially limited in the major life activity of working as a result of the wrist, neck and back injuries he sustained in August 2001, he has failed present any evidence in support of this claim.  In addressing whether an individual is "substantially limited" in the major life activity of working, the Supreme Court in *Sutton* stated:

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice.  If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs.  Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

527 U.S. at 492.  In determining whether plaintiff is precluded from a substantial class or broad range of jobs, the Court must compare plaintiff's "access to jobs to the access available to a non-injured individual with similar training and experience, looking specifically to the labor market in the claimant's geographic vicinity." *Mahon*, 295 F.3d at 591, citing *Sutton*, 527 U.S. at 491-92; *Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 253-54 (6th Cir. 2000).

Plaintiff has made absolutely no attempt to show he meets the *Sutton* standard.  Plaintiff fails to present any evidence whatsoever indicating what substantial class or broad range of jobs he was precluded from performing as a result of his alleged impairments.  The fact that plaintiff submitted generalized doctor's statements requesting he be excused "from work" and indicating

24

he was released back "to work" on February 4, 2002 (Allen Depo., Exhs. C-N) does not amount to an acknowledgment that he is substantially limited in his ability to perform a substantial class of jobs. *Sutton*, 527 U.S. at 492. The general statements from his doctors are not probative of whether plaintiff suffers from a disability. Nothing in the statements discusses his physical or mental health, or mentions a specific impairment or disability that caused him to be unable to perform a substantial class or broad range of jobs. The doctor's statements, fairly read, indicate at most that plaintiff could not perform his particular job. Accordingly, plaintiff has failed to meet his burden of showing that his physical condition included an impairment that substantially impaired the major life function of working.

Second, plaintiff fails to establish he was regarded as disabled by defendant. In determining whether an individual may be regarded as having a disability, the Court must consider whether "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489. Under either scenario, plaintiff must show the employer harbored a misperception about him: that defendant believed plaintiff had a substantially limiting impairment that he in fact did not have or believed that plaintiff had a substantially limiting impairment when, in fact, the impairment was not so limiting. *Id. See also Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001). Accordingly, "the ADA protects those individuals 'regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties.'" *Rodgers v. Norfolk Southern Corporation,*

25

304 F. Supp.2d 961, 968 (S.D. Ohio 2003) (Sargus, J.), citing *Ross,* 237 F.3d at 706. The Sixth

Circuit in *Ross* stated it is difficult to prove that an employer regarded the employee as

substantially limited in the major life activity of working because the plaintiff must demonstrate

not only that his employer thought he was disabled, but also that his employer thought his

disability would prevent him from performing a broad class of jobs. *Ross*, 237 F.3d at 709. A

question of fact was presented on this issue in *Ross* because there was substantial evidence[1] that

the plaintiff's medical status played a significant role in his discharge, as well as evidence that

the employer concocted a pretextual justification for the discharge. *Id.* Unlike *Ross*, the

evidence presented in this case is not sufficient to lead a rational trier of fact to find defendant

Deerfield Inc. believed plaintiff had a disability that would prevent him from performing a broad

class of jobs.

Plaintiff asserts that defendant regarded him as disabled because it never considered

plaintiff as a "qualified" applicant for employment with Deerfield Inc. since he was on leave due

to his physical impairment and was "not allowed to apply for any job until he was released to

work without restrictions." (Doc. 28 at 8-9, citing Freeman Aff. ¶9). As explained above in

connection with plaintiff's race discrimination claim, Ms. Freeman's statement suggesting

plaintiff wait to apply for employment with Deerfield Inc. until he was released for work by his

doctor did not amount to a prohibition on applying for employment with Deerfield Inc., but

rather recognition that plaintiff did not qualify for preferential consideration for employment

with the new company as an existing Deerfield Company employee because he was not an active

---

[1] The "substantial evidence" to which the *Ross* Court referred included (1) an interoffice managerial memo by one of the plaintiff's supervisors asking, "When can we bring this problem person to a termination status [?] P.S. - - Back Case," and (2) evidence that after the plaintiff's fifth back injury, his supervisors invited him to retire, placed him on probation, gave him a sharply negative performance review, and assigned him significantly higher sales quotas.

Deerfield Company employee. The only thing plaintiff was not "qualified" for was preferential or early consideration for employment prior to the sale of Deerfield Company to Deerfield Inc. on February 1, 2002 because he simply was not on the plant floor doing his job and capable of being observed by Ms. Freeman and Mr. Rogers during the evaluation period. The January 24, 2002 conversation with Ms. Freeman reflects plaintiff's concern with not missing a deadline which did not apply to him, a non-active Deerfield Company employee; he never inquired whether he could apply before February 4, 2002, but rather whether he was obligated to apply by a certain deadline. Nothing and no one prohibited plaintiff from applying with Deerfield Inc. at any time. The evidence does not show defendant mistakenly regarded plaintiff as being unable to work under the ADA.

Plaintiff also argues that defendant Deerfield Inc. utilized a "100% healed rule" requiring plaintiff to return to work without restriction and therefore "regarded" him as disabled, citing *Henderson v. Ardco, Inc.*, 247 F.3d 645, 647 (6th Cir. 2001) in support of his argument. In *Henderson*, the Sixth Circuit stated, "Where the 100% rule is applied to mildly impaired persons to exclude them from a broad class of jobs, it may be treating them as disabled even if they are not. . . ." *Id*. In other words, the application of a 100% healed rule could lead to the misperception that a person's physical restrictions substantially limit his ability to work when in fact they do not. Plaintiff argues that defendant's application of the 100% healed rule in his case resulted in the perception that plaintiff's condition substantially limited his ability to perform every job in defendant's facility. He contends that defendant applied the 100% rule to exclude him from all jobs at its plant, and thus perceived him to be disabled. The undersigned disagrees for three reasons.

27

First, plaintiff presents no evidence whatsoever the defendant Deerfield Inc. had or has a "100% healed rule." Rather, the only evidence plaintiff cites in support of his argument is his affidavit which concerns a "100% healed rule" utilized by Deerfield Company:

> After my injury in August of 2001, I repeatedly attempted to return to work on a light duty basis and my doctors would have allowed me to do so. (See notes attached as Exhibit 4). Ms. Freeman would never let me do so, and told me several times that I could not return to work until I was "100% healed["] and did not have any restrictions.

(Doc. 30, Allen Aff. ¶12). The notes referenced in Exhibit 4 are purportedly from plaintiff's hand doctor dated November 28, 2001 and December 12, 2001. Yet, plaintiff was not employed by defendant Deerfield Inc. in 2001, but by Deerfield Company. Deerfield Inc. did not begin doing business until February 1, 2002. Therefore, even assuming plaintiff was capable of performing light duty work in 2001, the 100% rule applied to Deerfield Company and not defendant Deerfield Inc.

Second, plaintiff's evidence simply does not support his argument. Plaintiff contends his doctors would have permitted him to return to light duty work. The first doctor's note he cites is dated November 28, 2001 and shows three seemingly inconsistent work abilities checked on the form: "May not return to work or school in any capacity at this time," "May return to work or school without restriction on _____" without any date inserted, and "May return to work or school with restrictions below on 12/19/01 (Estimated date)" without any "restrictions" checked on the form. (Doc. 30, Exh. 4). This clearly does not support plaintiff's contention that he was capable of light duty work in November or December 2001. The second doctor's note cited is dated December 12, 2001 and shows a check mark next to the statement "May not return to work or school in any capacity at this time" with the handwritten notation "since no light duty

available."  The document also shows a check mark next to "May return to work or school

without restriction on _____ (Estimated date) __1/7/02___ (Actual date)." (Doc. 30, Exh. 4).

However, the record also contains statements from plaintiff's other doctor, a chiropractor,

requesting plaintiff be excused "from work" for the same and subsequent time periods without

any indication he was capable of light duty or any other work with restrictions. (Allen Depo.,

Exhs. K-N).  Thus, plaintiff considered himself unable to perform the functions of his job prior

to February 4, 2002 and submitted documentation to that effect.  Therefore, he could not be

"regarded as disabled" by the employer because he deemed himself disabled.

Third, *Henderson* specifically declined to create a per se rule that an employer's use of

the 100% healed rule violates the ADA as plaintiff urges in this case. 274 F.3d at 653-54.  The

100% rule must be viewed in connection with the employer's perception about the plaintiff's

suitability for a class of relevantly similar employment given his impairments. *Id*.  The plaintiff

in *Henderson* submitted evidence that the employer perceived there was no job for her at the

company's facility given her back injury.  This evidence included a statement from her doctor

approving her return to work, but with restrictions as to her lifting; the plant manager's refusal to

reinstate the plaintiff advising her: "You know what company policy is . . . you have to be 100

percent to work here;" and the employer's denial that any jobs existed which would

accommodate plaintiff's restrictions despite documentary evidence showing the contrary.  The

plaintiff's evidence in *Henderson* was sufficient to show that her employer considered her back

injury disqualified her from working in any position within its plant and thus gave an indication

of the employer's perception about her suitability for a class of relevantly similar employment.

247 F.3d at 653-54.

Plaintiff here has made no such showing.  None of the evidence introduced by plaintiff shows defendant perceived him as unable to perform a larger class of jobs available within his alleged "light" restriction.  At most, defendant perceived, through Ms. Freeman, that plaintiff was incapable of returning to his job as a forklift operator until February 4, 2002, the date his doctor released him for work.  There is no evidence Deerfield Inc. considered that plaintiff's impairments disqualified him from all jobs within defendant's facility.  For these reasons, plaintiff has failed to make a showing that defendant regarded him as disabled under the ADA.

Although plaintiff contends the question of defendant's subjective intent must be presented to a jury rather than disposed of on a motion for summary judgment, citing *Ross*, 237 F.3d at 706, plaintiff here, unlike the plaintiff in *Ross*, has not even presented a modicum of evidence that defendant Deerfield Inc. perceived him as disabled under the ADA or had a discriminatory motive in its decision not to hire him. Where there are no genuine disputes of material fact, even a subjective issue such as motive is proper for resolution on summary judgment, since the Court is not required to weigh evidence, make credibility determinations, or determine the truth of the matter.  *See Anderson*, 477 U.S. at 249.

As plaintiff fails to satisfy the first element of his *prima facie* case of disability discrimination, *i.e.,* that he is an individual with a disability, the Court need not reach whether he was otherwise qualified to perform a job's requirements, with or without reasonable accommodation, or whether he was discriminated against solely because of a disability.  Because plaintiff fails to establish a *prima facie* case of disability discrimination, defendant's motion for summary judgment on plaintiff's disability claims should be granted.

**IV.  PLAINTIFF'S PUBLIC POLICY CLAIMS SHOULD BE DISMISSED.**

Plaintiff contends that defendant's refusal to hire plaintiff undermines the public policy against such conduct "as set forth in Chapter 4123 of the Ohio Revised Code and O.R.C. § 4123.90." (Doc. 11 at 3).  Plaintiff contends the essence of this claim is defendant's alleged "refus[al] to allow plaintiff to submit an application or be considered for employment until his workers' compensation leave was exhausted." (Doc. 28 at 12).  Contrary to plaintiff's claim, there is no evidence that defendant prohibited plaintiff from filing an application for employment or to be considered for employment prior to the exhaustion of his workers' compensation leave. In any event, plaintiff asks the Court to develop a new public policy claim for "wrongful hiring" under Ohio law, a claim that has not yet been recognized by the Ohio courts.  This Court should decline to do so in the first instance and, because plaintiff fails to establish a viable federal law claim as explained above, should decline to exercise pendent jurisdiction over such claim.  *See United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).  Accordingly, plaintiff's state law public policy claims should be dismissed without prejudice for lack of jurisdiction.

**V.  DEFENDANT'S MOTION TO STRIKE SHOULD BE DENIED AS MOOT.**

Defendant's motion to strike (Doc. 35) seeks an order striking all references of statements, comments, actions, or conduct of individuals while acting as employees of Deerfield Manufacturing Company as evidence against defendant Deerfield Inc.  Defendant also moves to strike as hearsay the statements concerning alleged conversations between plaintiff and Venita Watson.  Because the undersigned recommends that defendant's motion for summary judgment be granted, the motion to strike should be denied as moot.

31

## IT IS THEREFORE RECOMMENDED THAT:

1.  Defendant's motion for summary judgment be **GRANTED**.

2.  Defendant's motion to strike be **DENIED** as moot.

Date: 9/26/2005                        s/Timothy S. Hogan
                                             Timothy S. Hogan
                                             United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MAURICE B. ALLEN,                                    Civil Action No. 1:02-cv-492

      Plaintiff,

      vs.

DEERFIELD MANUFACTURING
INCORPORATED, A SUBSIDIARY
OF ICE INDUSTRIES**,**

      Defendant.                                    (Spiegel, J.; Hogan, M.J.)


## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN (10) DAYS** after being served with a copy thereof.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).