UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MAURICE B. ALLEN,             :    NO. 1:02-CV-00492
                              :
        Plaintiff,            :
                              :    **OPINION AND ORDER**
    v.                        :
                              :
                              :
DEERFIELD MANUFACTURING       :
INCORPORATED, A SUBSIDIARY    :
OF ICE INDUSTRIES,            :
                              :
        Defendant.            :


    This matter is before the Court on the Report and
Recommendation of the Assigned Magistrate Judge (doc. 42), the
Plaintiff's Objections thereto (doc. 45), and the Defendant's
Response to Plaintiff's Objections (doc. 46). Also before the
Court is the Plaintiff's Reply in Support of Plaintiff's
Objections (doc. 47), the Defendant's Motion to Strike
Plaintiff's Reply in Support (doc. 48), and Plaintiff's
Memorandum in Opposition to Defendant's Motion to Strike (doc.
49). For the following reasons the Court rejects in part the
assigned Magistrate Judge's Report and Recommendation.

    Plaintiff Maurice B. Allen brings this action against
Defendant Deerfield Manufacturing Inc., a subsidiary of Ice

1

Industries, alleging that Defendant discriminated against him on the basis of his race in violation of 42 U.S.C. §§ 1981 and 2000e-2, as well as sections 4112.02(A) and 4112.99 of the Ohio Revised Code (doc. 42). Plaintiff further alleges that Defendant discriminated against him on the basis of a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12010, as well as sections 4112.02(A) and 4112.99 of the Ohio Revised Code (doc. 42). Lastly, Plaintiff claims that Defendant violated Ohio public policy, as stated in section 4123.90 of the Ohio Revised Code, by refusing to rehire him because of his prior work-related injury and subsequent Worker's Compensation claim (Id.).

Before the Magistrate Judge were the Defendant's Motion for Summary Judgment (doc. 19), Defendant's Proposed Findings of Fact and Conclusions of Law (doc. 20), the Affidavit of Janet Freeman in Support of Defendant's Motion for Summary Judgment (doc. 23), Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment and Appendix in Support Thereof (docs. 28, 30), and Defendant's Reply Memorandum in Support of its Motion for Summary Judgment (doc. 34). Also before the Magistrate Judge were Defendant's Motion to Strike (doc. 35), Plaintiff's Memorandum in Opposition to the Motion to Strike (doc. 38), and

2

Defendant's Reply Memorandum in Support of the Motion to Strike (doc. 41). On September 28, 2005 the Magistrate Judge issued his Report and Recommendation in which it was recommended that Defendant's Motion for Summary Judgment be granted and that Defendant's Motion to Strike be denied as moot (doc. 42).

**FACTS**

The following facts are taken from the Magistrate Judge's Report and Recommendation and are not largely contested by the Plaintiff. Plaintiff is African American and was employed by Deerfield Manufacturing Company (hereinafter "Deerfield I") from September 1996 until his termination on July 31, 2002 (Id.). Plaintiff was an operator and forklift driver for Defendant (Id.). Deerfield I is not a party to this lawsuit (Id.).

On August 15, 2001, Plaintiff was injured in an automobile accident that occurred in the parking lot of Deerfield I (Id.). The accident resulted in injury to Plaintiff's wrist, neck, and back (Id.). As a result of the injury, Plaintiff could not perform his job duties and, consequently, applied for Worker's Compensation benefits (Id.). Deerfield I contested the claim, arguing that Plaintiff's injury was not work-related (Id.). Plaintiff's claim was initially denied; however, he appealed and benefits were subsequently granted (Id.). Plaintiff

3

ultimately underwent surgery on his wrist and was on leave due to his Worker's Compensation injury from August 2001 until February 4, 2002, when he was released by his doctor to return to work (Id.).

Deerfield I ceased doing business on January 31, 2003 (Id.). Deerfield I was sold to Deerfield Inc. (hereinafter "Deerfield II" or "Defendant"), which began doing business on February 1, 2002 (Id). Janet Freeman (hereinafter "Freeman"), Human Resources Manager at Deerfield I and, subsequently, Deerfield II, states that while Deerfield II was not required to retain any of the employees from Deerfield I, it was hoped that many of Deerfield I's employees would be hired by Deerfield II (Id.). Freeman and Dave Randall (hereinafter "Randall"), another Deerfield I employee, assisted Deerfield II by evaluating "active" employees of Deerfield I in December 2001 and January 2002 for possible employment with Deerfield II (Id.).

All of Deerfield I's employees were laid off in November 2001, called back to work as active employees of Deerfield I, in January 2002, and considered for employment with Deerfield II (Id.). Deerfield II required, in order for Deerfield I employees to be considered for employment, that an employee be actively working for Deerfield I, submit an

4

application for employment with Deerfield II, and be able to begin work on February 1, 2002 (Id.).  Applications for employment with Deerfield II were available on a table outside of the human resource department in January and February 2002 (Id.).

Freeman walked the plant floors of Deerfield I during December 2001 to January 2002 to evaluate the active employees of Deerfield I (Id.).  Any Deerfield I employee not actively working during the evaluation period was not considered for employment with Deerfield II prior to the birth of that company (Id.).  Any employee of Deerfield I on sick leave or Worker's Compensation during this time frame was not considered for employment with Deerfield II (Id.).  Initially, individuals either on sick leave or Worker's Compensation leave included Plaintiff and two Caucasian males, Earl Baker (hereinafter "Baker") and Jacky Collett (hereinafter "Collett") (Id.).  However, Baker returned from Worker's Compensation leave in mid-January 2002 during the evaluation period and was evaluated for employment with Deerfield II (Id.).  Neither Plaintiff nor Collett returned during the evaluation period and, thus, were not evaluated for employment with Deerfield II (Id.).

Many of the active Deerfield I employees were not hired by Deerfield II (Id.).  A Caucasian male was not hired as a

5

result of his poor work ethic (Id.). Also, employees with attendance problems were not hired by Deerfield II (Id.). All of the non-Caucasian, active employees of Deerfield I were hired by Deerfield II, while the active employees of Deerfield I who were not hired by Deerfield II were all Caucasians (Id.).

On January 22, 2002, while Plaintiff was still on Worker's Compensation leave, he ran into a co-worker from Deerfield I at a local store (Id.). Venita Watson (hereinafter "Watson"), the co-worker, told Plaintiff that Deerfield I had been sold and that all employees were in the process of filling out applications for Deerfield II (Id.). Watson alerted Plaintiff to the deadline for filling out the application and offered to bring him an application packet (Id.).

The following day Plaintiff attempted to contact Freeman (Id.). Plaintiff and Freeman spoke on January 24, 2002 (Id.). Plaintiff asked Freeman about the sale and the application deadline (Id.). Freeman confirmed that she was in receipt of Plaintiff's most recent doctor's note, indicating a release to work date of February 4, 2002 (Id.). Freeman indicated to Plaintiff that he should not fill out an application because he had not yet been released to return to work (Id.). Freeman notes that she had doubts concerning Plaintiff's ability

6

to return to work on February 4, 2002 as indicated in his doctor's note (Id.). This opinion of Freeman's was based on past instances involving Plaintiff wherein he would submit doctor's notes indicating a return to work release date which would then later be extended beyond the stated date (Id.). Freeman wound-up telling Plaintiff that he could fill out an application for employment with Deerfield II upon his February 4, 2002 return to work (Id.).

On January 30, 2002, Freeman sent Plaintiff, via certified mail, a letter advising him that his employment with Deerfield I ended as of midnight January 31, 2002 (Id.). Plaintiff did not believe that this letter had any impact on his prospective employment with Deerfield II (Id.). On February 1, 2002, Deerfield II purchased the assets of Deerfield I and commenced operations (Id.). On February 4, 2002, Plaintiff arrived at Deerfield II and entered the plant via the employee entrance (Id.). Plaintiff maintains he went to Deerfield II to complete an application (Id.).

Plaintiff avers that when he entered the Deerfield II plant Freeman was in the lobby near the time clock (Id.). Freeman inquired of Plaintiff whether he had received her January 30, 2002 letter; he answered affirmatively (Id.). Plaintiff

7

further maintains that Freeman requested that he leave the plant as Deerfield II was not going to hire him (Id.). Freeman purportedly mentioned nothing about Plaintiff completing an application on February 4, 2002 (Id.). Freeman escorted Plaintiff to the locker room so that he could retrieve his work boots and then escorted Plaintiff out of the building, stating "Good luck in whatever you do" (Id.). Upon leaving Deerfield II, Plaintiff went to the Equal Employment Opportunity Commission to inquire about filing a discrimination claim (Id.). Plaintiff also visited the unemployment office, which Plaintiff maintains Freeman had recommended he do, and filed an application for unemployment (Id.).

Freeman has a different account of the events that day (Id.). Freeman indicates that when Plaintiff entered the employee entrance of Deerfield II on February 4, 2002 that she approached him, viewing him as a non-employee (Id.). Freeman told Plaintiff that he was not supposed to be there (Id.). Freeman states she told Plaintiff that he had not been hired by Deerfield II and that he would have to fill out an application for employment (Id.). Freeman directed Plaintiff to the applications (Id.). Freeman contends that Plaintiff misunderstood her and wrongly concluded that Deerfield II had actually

8

considered him for employment but decided not to hire him (Id.).
Rather, Freeman maintains, Plaintiff was never considered for
employment because he was not an active employee of Deerfield I
during the evaluation period and failed to submit a timely
application for employment (Id.). Freeman disputes that she
directed Plaintiff to the unemployment office (Id.). Freeman
maintains that she had indeed told Plaintiff that he could fill
out an application for employment with Deerfield II on February
4, 2002 (Id.).

Deerfield II did not have enough operators employed at
the plant and had placed advertisements for that position in the
newspaper (Id.). On February 4, 2002, Deerfield II hired Karl
Roth (hereinafter "Roth) and Carrie Nelson Gibson (hereinafter
"Gibson") to work as second shift operators (Id.). Roth and
Gibson are both Caucasian (Id.). Roth and Gibson were both
employees of Deerfield who left on good terms and applied for a
position with Deerfield II (Id.).

As of February 4, 2002, Plaintiff was not disabled and
was capable of performing his job one hundred percent (Id.).
Plaintiff's last job at Deerfield was operating a fork lift for
the 73 Line (Id.). Deerfield II was not operating the 73 Line in
February 2002 and no fork lift operator was needed for that Line

9

(Id.).  Prior to filing this lawsuit, Plaintiff did not submit an application for employment at Deerfield II (Id.).

The Magistrate Judge aptly notes the applicable legal standard for determining whether to grant Defendant's Motion for Summary Judgment (Id.).  As such, the Court will not restate the applicable summary judgment standard (Id.).  Rather, the Court will immediately turn to the analysis the Magistrate Judge utilized in recommending that Defendant's Motion be granted.

The Magistrate Judge correctly notes that Plaintiff's claims concern Deerfield II's failure to hire him for a job notwithstanding Plaintiff's use of the term "rehire" in certain instances in his Amended Complaint (doc. 42).  As such, the Magistrate Judge recommends that the Court decline to grant summary judgment for Defendant on this basis (Id.).  The Court agrees.

Plaintiff claims he was discriminated against on the basis of his race in violation of 42 U.S.C. § 2000e-2, 42 U.S.C. § 1981, Ohio Rev. Code § 4112.02(A), and Ohio Rev. Code § 4112.99 (Id.).  The Magistrate Judge's recitation of Title VII and other applicable law is correct:  He notes:

- It is unlawful for an employer to refuse to hire an individual or to otherwise discriminate against an individual with respect to compensation, terms, conditions,

10

or privileges of employment because of such individual's race.  42 U.S.C. § 2000e-2(a)(1).

- The standards for establishing a discrimination claim under Title VII are equally applicable to Plaintiff's claims under 42 U.S.C. § 1981 and Ohio Rev. Code § 4122.  <u>Dews v. A.B. Dick Co.</u>, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000).

- Plaintiff may establish a <u>prima facie</u> case of discrimination either by presenting direct evidence of intentional discrimination by the Defendant, <u>Thurman v. Yellow Freight Sys., Inc.</u>, 90 F.3d 1160, 1166 (6th Cir. 1996), or by showing the existence of circumstantial evidence which creates an inference of discrimination.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).

- Plaintiff may establish a <u>prima facie</u> case of race discrimination, using the existence of circumstantial evidence, by showing:

  o He is a member of a racial minority;
  o He applied and was qualified for a job for which the employer was seeking applicants;
  o That, despite his qualifications, he was rejected; and
  o That, he was replaced by a person outside the protected class, or after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993).

- Such proof "in effect creates a presumption that the employer unlawfully discriminated against the employee." <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981).

- If Plaintiff does not establish a <u>prima facie</u> case, defendant is entitled to judgment.  <u>Mitchell</u> at 582-84.

- If the Plaintiff presents evidence sufficient to establish a <u>prima facie</u> case of discrimination, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  <u>Burdine</u> at 253.

11

- If the Defendant proffers a legitimate, non-discriminatory reason, the burden shifts back to the Plaintiff to demonstrate that Defendant's articulated reason is merely pretext for unlawful discrimination, Id. at 253; in other words, Plaintiff must show that the proffered explanation is unworthy of credence or that Defendant was more likely motivated by a discriminatory reason. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1082 (6th Cir. 1994). In rejecting the Defendant's stated explanation, there must be "a sufficient basis in the evidence" for rejecting said explanation. Id. at 1083.

- "The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination and that the employer intended to discriminate on the basis of race." Thurman at 1666.

Having aptly stated the law, the Magistrate Judge next applies the circumstances of this case to the law as noted above (doc. 42). The Magistrate Judge reports that Plaintiff presents no direct evidence of intentional discrimination on the part of Deerfield II (Id.). As such, the Plaintiff must prove his case using the McDonnell/Douglas-Burdine shifting paradigm as outlined above. The Court agrees that Plaintiff has not produced direct evidence of discrimination. Using this shifting paradigm, the Magistrate Judge reports that Plaintiff has presented evidence establishing that he is: (1) a member of a protected class, specifically, African American; (2) that he was qualified for the position; and (3) that Deerfield II hired two Caucasians, Roth and Gibson (doc. 42). Plaintiff claims that although he did not

file an application for employment with Deerfield II, he was nevertheless denied the opportunity to apply for any available jobs (Id.). Thus, the Plaintiff contends that he has met the fourth requirement of his prima facie case. The Magistrate Judge disagrees (Id.).

Citing McDonnell Douglas, the Magistrate Judge reports that as part of Plaintiff's prima facie case of discrimination, he must meet the requirement that he applied for the job for which Deerfield II was seeking applicants (Id. citing McDonnell Douglas at 802). The purpose of this application element is to eliminate a common non-discriminatory reason for rejecting a job application; his failure to apply. Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984). However, the Magistrate Judge notes that the Sixth Circuit has recognized that in limited circumstances a plaintiff may maintain a failure-to-hire claim under Title VII without having formally applied for the position. Wanger v. G.A. Gray Co., 872 F.2d 142, 145 (6th Cir. 1989).

These circumstances include an environment created by the employer in which prospective applicants understand that a formal application would be futile because discrimination is so entrenched or pervasive. See e.g., Wanger at 145 citing Babrocky

13

v. Jewel Food Co. & Retail Meatcutters Union, Local 320, 773 F.2d 857 (7th Cir. 1985) (employer created atmosphere were female employees understood applying for certain positions would be futile); International Brotherhood of Teamsters v. United States, 431 U.S. 324, 367-68 (1977) ("A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection"). For this exception to apply, a pervasive, consistent, and continuing pattern or practice of discrimination must be shown to excuse an applicant from formally applying for the position. Teamsters at 365-68. Also included is the situation where the employer has a practice of hiring without asking for applications or posting the opening. Wagner at 146 citing Box v. A&P Teac Co., 772 F.2d 1372, 1376 (7th Cir. 1985), cert. denied, 478 U.S. 1010 (1986). In this circumstance, a plaintiff must show that he would have applied for the position had he been aware of it. Id.

The Magistrate Judge concludes that Plaintiff has not demonstrated that a pattern or practice of discrimination at Deerfield II existed such that submitting a formal application would have been futile (Id.). Indeed, notes the Magistrate Judge, all former non-Caucasian employees of Deerfield I who

14

applied for employment with Deerfield II were hired (Id.). Nor has the Plaintiff, reports the Magistrate Judge, shown that Deerfield II had a policy of hiring without publicizing the position or requiring a formal application (doc. 42). The Magistrate Judge highlights Plaintiff's testimony that he knew all Deerfield I employees were required to submit applications for employment consideration with Deerfield II, specifically speaking with Freeman concerning this requirement (Id.).

The Magistrate Judge reports that Plaintiff's reliance on Dews v. A.B. Dick Co., 231 F.3d 1016 (6th Cir. 2000) is misplaced (doc. 42). In Dews, the court held:

> [I]n failure to promote cases a plaintiff does not have to establish that he applied for and was considered for the promotion *when the employer does not notify its employees of the available promotion* or does *not provide a formal mechanism* for expressing interest in the promotion. Instead, the company is held to a duty to consider all those who might reasonably be interested in a promotion were its availability made generally known.

Dews at 1022 (emphasis added). The Magistrate Judge notes that the instant matter is not a failure to promote case, as in Dews (doc. 42). Furthermore, notes the Magistrate Judge, Dew's rationale is inapplicable to the matter before the Court (Id.). The Magistrate Judge concludes that unlike the plaintiff in Dews, it is undisputed that Plaintiff was aware of the employment

15

opportunities with Deerfield II (Id.).  It is also undisputed that Deerfield II had a formal application process and that "all employees [of Deerfield II] had to put in new applications in order to work for the new company" (Id.).  Plaintiff also did not lack notice of the available positions (Id.).  Thus, reports the Magistrate Judge, Dews does not excuse Plaintiff's failure to submit an application (Id.).

The Magistrate Judge finds no evidence to support Plaintiff's claim that Freeman prohibited him from filling out an application either prior or subsequent to February 4, 2002 (Id.).  Freeman did not specifically tell Plaintiff not to complete an application until February 4, 2002; rather, in response to Plaintiff's inquiry about an application deadline that did not apply to him as a non-active Deerfield I employee, Freeman told Plaintiff he did not "have to put [his] application in" on January 4, 2002, the date of their telephone conversation, but could "wait until February 4th when the doctor release[d] [him] to put [his] application in" (Id.).

The Magistrate Judge also addresses the fact that Plaintiff was asked to leave an employee-only area of Deerfield II by Freeman when he was not an employee of Deerfield II (Id.).  This the Magistrate Judge reports does not imply that it was futile

16

for Plaintiff to file an application for employment (Id.). Every other person hired by Deerfield II was required to complete a formal application for employment (Id.). Excepting Plaintiff from this requirement, concludes the Magistrate Judge, would "allow the exception to swallow the rule" (Id.). Citing Wanger, the Magistrate Judge notes that were "an application not necessary, then nearly every decision to hire or promote would be subject to challenge." Wanger at 147.

The Plaintiff notes that it is undisputed that he contacted Freeman in January 2002 to inquire about application deadlines (Id.). During this conversation, Plaintiff informed Freeman that he desired to complete an application for employment consideration (Id.). Plaintiff highlights Freeman's verification that she received his doctor's note, releasing him for work on February 4, 2002; and, furthermore, her acknowledgment that she told Plaintiff to submit an application on February 4, 2002 (Id.). Plaintiff did as Freeman instructed - namely, he went to the plant on February 4, 2002, but was purportedly told that Deerfield II had decided not to hire him, that he needed to leave the plant, and that he could file for unemployment benefits (Id.). Of course the specific details of February 4, 2002 are hotly disputed, as noted above in the Fact section of this Order.

17

However, Plaintiff avers that a reasonable jury could determine that he was denied an opportunity to apply for any available jobs at Deerfield II (Id.).  The Court agrees and finds that a reasonable jury could find that Plaintiff was prevented from applying for available jobs at Deerfield II.  Whether to believe Plaintiff's or Freeman's account of the events of February 4, 2002 is appropriate only for the trier of fact.

Yet, even if the Court were to permit an exception to the application requirement, states the Magistrate Judge, Plaintiff can not carry his burden of persuasion as to Defendant's legitimate, non-discriminatory reason (doc. 42).  Defendant's legitimate, non-discriminatory reason for not hiring Plaintiff is that he did not complete an employment application as required (Id.).  To prove pretext, a plaintiff must show that defendant's proffered reason:

> (1) had no basis in fact;
> (2) did not actually motivate defendant's hiring decision; or
> (3) was insufficient to motivate that decision.

Manzer at 1084.  Under the first basis, the plaintiff must produce evidence showing that the reason given by the employer simply did not happen.  Id.  As to the second possibility, more than the "bare bones of plaintiff's prima facie case" is

18

required.  Id.

> [T]he plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate [the hiring decision]. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to idict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant.  In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is pretext, or coverup.

Id. (emphasis in original).  "[I]n order to make this type of rebuttal showing, the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of . . . discrimination."  Id.  The third scenario requires plaintiff to produce evidence showing that he was treated differently than similarly situated employees, particularly employees not in the protected class.  Id.

The Magistrate Judge finds that Plaintiff does not establish pretext under the first scenario enunciated in Manzer, finding that Deerfield II's proffered reason is not factually false as Plaintiff has not produced evidence showing that he indeed submitted an application (doc. 42).  The Magistrate Judge also finds that Plaintiff can not establish pretext using the third prong of Manzer (Id.).  It is undisputed that all employees of

19

Deerfield I who desired a position with Deerfield II were required to submit an application (Id.). As the Magistrate Judge notes, a showing that an employer's stated reasons are insufficient to motivate its actions ordinarily "consists of evidence that other employees, particularly employees not in the protected class" were not adversely treated despite "substantially identical conduct." Manzer at 1084. Evidence has not been submitted, concludes that Magistrate Judge, highlighting employees outside the protected class who were hired absent the filing of an employment application (Id.).

Finally, the Magistrate Judge submits that Plaintiff has not produced any circumstantial evidence that it is "more likely than not" that Deerfield II's explanation was pretext for race discrimination (doc. 42). Therefore, having failed to establish a prima facia case, or in the alternative pretext, the Magistrate Judge recommends that Deerfield II's Motion for Summary Judgment as to Plaintiff's race discrimination claims be granted (doc. 42).

The Plaintiff argues that evidence has been established that could lead a reasonable jury to conclude that Defendant's legitimate, non-discriminatory reason was false (doc. 45). The Plaintiff acknowledges that he did not submit an application

20

(<u>Id</u>.).  However, Plaintiff notes that he made the Defendant aware of his desire to do so and went to the plant on February 4, 2002 with the intention of completing an application (<u>Id</u>.).  The Plaintiff highlights that Freeman admits Plaintiff told her on February 4, 2002 that he wanted to apply for a job (<u>Id</u>.).  And, as noted above, the actual circumstances of this conversation are in dispute.  Plaintiff submits that Freeman told him that Deerfield II had decided not to hire him and that he needed to leave the plant (<u>Id</u>.).  Deerfield II states otherwise.  Whose version of that day's events is true is not for the Court to decide.  Rather, the trier of fact is the appropriate entity to make this credibility determination.  If, argues the Plaintiff, the trier of fact determines that Defendant prevented him from submitting an application, it could find that Defendant's legitimate, non-discriminatory reason (<u>i.e.</u>, that Plaintiff did not submit an application) was pretextual as that reason would have no basis in fact (<u>Id</u>.).  The Court agrees.

Furthermore, the Plaintiff contends that even if jurors decided Defendant's stated reason for rejecting Plaintiff had some factual basis, they could still find that Plaintiff's failure to formally submit an application was insufficient to motivate the decision (<u>Id</u>.).  Thus, argues Plaintiff, a

21

reasonable jury could find pretext under the third prong of Manzer (Id.). The Plaintiff maintains that the Magistrate Judge indicated evidence exists that Defendant decided not to hire Plaintiff before he attempted to complete the employment application (Id.). Therefore, the Plaintiff avers that his failure to complete an application could not have motivated Defendant's decision not to hire him (Id.).

Accordingly, the Plaintiff submits that he has indeed presented a prima facie case of race discrimination (Id.). One, Plaintiff made it clear he wanted a job, but was arguably denied the opportunity to apply (Id.). Two, he was not hired (Id.). Three, the same day that he was told that he had not been hired, two Caucasians were hired (Id.). And, four, Defendant's reason for not hiring Plaintiff was that he did not submit an application (Id.).

This, provided a reasonable jury concluded that Plaintiff was thwarted from applying, would establish a prima facie case. Plaintiff additionally notes that where an employee has established a prima facie case and where the employer's legitimate, non-discriminatory reason is ultimately found to be false, the trier of fact is permitted to conclude that the employer discriminated against the employee. See e.g., Reeves v.

_Sanderson Plumbing Prods., Inc._, 530 U.S. 133, 148 (2000).  The
Sixth Circuit has labeled this "pretext plus."  _Ross v. Campbell
Soup Co.,_ 237 F.3d 701 (6th Cir. 2001).  _Ross_ stated:

> [W]e are reminded that when the elements of a _prima
> facie_ case have been met, a plaintiff need not show
> both pretext and discriminatory intent ("pretext
> plus").  In _Reeves,_ the Court held that once the
> employer's justification has been eliminated,
> discrimination may well be the most likely alternative
> explanation, especially since the employer is in the
> best position to put forth the actual reason for its
> decision . . . Thus, a plaintiff's _prima facie_ case,
> combined with sufficient evidence to find that the
> employer's asserted justification is false, may permit
> the trier of fact to conclude that the employer
> unlawfully discriminated.

_Ross_ at 708-709.

Whether to grant summary judgment in favor of the Defendant
on the issue of race discrimination turns on which account of the
events of February 4, 2002 one is to believe.  If a reasonable
jury were to believe Plaintiff, then a genuine issue of material
fact exists as to this claim and summary judgment is
inappropriate.  Accordingly, the Court now turns to the
Magistrate Judge's discussion concerning Plaintiff's disability
discrimination claim.

Plaintiff claims he was discriminated against on the basis of
a disability in violation of the Americans with Disabilities Act

23

("ADA"), 42 U.S.C. § 12101, and Ohio Revised Code § 4112.02(A). The Magistrate Judge correctly cites the applicable law as it relates to these claims (Id.).  The Court summarizes:

- The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual.  42 U.S.C. § 12112(a).

- Ohio also prohibits disability discrimination in employment. Ohio Rev. Code § 4112.02(A).

- The elements necessary to prove both a claim under ADA and Section 4112.02(A) of the Ohio Revised Code are the same. Rosso v. A.I. Root Co., 97 Fed. Appx. 517, 521 (6th Cir.), cert. denied, 534 U.S. 1001 (2004).

- The McDonnell Douglas/Burdine burden-shifting paradigm is used in employment discrimination cases based on disability. Kocsis v. Multi-Care Mang't, Inc., 97 F.3d 876, 882 (6th Cir. 1996).  In making a prima facie case under the ADA, a plaintiff must show:

  - that he is an individual with a disability;
  - who was otherwise qualified to perform a job's requirements, with or without reasonable accommodations; and
  - who was discriminated against solely because of the disability.  Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002).

- An individual inquiry must be made in determining whether an individuals is disabled.  Cotter v. Ajilon Servs., Inc., 287 F.3d 593, 598 (6th Cir. 2002), citing Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999).  Under the ADA, an individual is considered disabled if he:

24

- • [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

- • [has] a record of such impairment; or

- • [is] regarded as having such an impairment. 42 U.S.C. § 12102(2), see also Ohio Rev. Code § 4112.01(A)(13).

- "A record of impairment means an individual has 'a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." MX Group, Inc. v. City of Covington, 293 F.3d 326, 339 (6th Cir. 2002), quoting 28 C.F.R. § 34.104(3).

- "Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Federal regulations set forth the following factors to be considered in determining whether an individual is "substantially limited" in a major life activity:

  - • The nature and severity of the [plaintiff's] impairment;

  - • The duration or expected duration of the impairment; and

  - • The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

- The terms "substantially limits" and "major life activity" must be "interpreted strictly to create a demanding standard for qualifying as disabled." Toyota Motor Mfg. Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002). An impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA. Mahon at 590-91.

- The Supreme Court has defined "substantially limited" as preclusion "from more than one type of job, a specialized job, or a particular job of choice . . . if jobs utilizing

25

an individual's skills . . . are available, one is not precluded from a substantial class of jobs . . ." <u>Sutton</u> at 492.  Likewise, if a number of different types of jobs are available, one is not precluded from a broad range of jobs. <u>Id</u>.

- In determining whether a plaintiff is precluded from a substantial class or broad range of jobs, a court must compare plaintiff's "access to jobs to the access available to a non-injured individual with similar training and experience, looking specifically to the labor market in the claimant's geographic vicinity."  <u>Mahon</u> at 591 (<u>internal citations omitted</u>).

- When determining if a plaintiff was considered disabled, the court must ask whether: "(1) a covered entity mistakenly believe[d] that . . . plaintiff ha[d] a physical impairment that substantially limit[ed] one or more major life activities or (2) a covered entity mistakenly believe[d] that an actual, nonlimiting impairment substantially limit[ed] one or more major life activities."  <u>Sutton</u> at 489.

  - In other words, "the ADA protects those individuals 'regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." <u>Rodgers v. Norfolk Southern Corp.</u>, 304 F. Supp. 2d 961, 968 (S.D. Ohio 2003) (Sargus, J.), <u>citing</u> <u>Ross</u> at 706.

  - Additionally, a plaintiff must demonstrate not only that his employer thought he was disabled, but also that his employer thought his disability would prevent him from performing a broad class of jobs.  <u>Ross</u> at 709.  This, the Sixth Circuit noted, is difficult to prove.  <u>Id</u>.

It should be noted from the onset that Plaintiff argues he is "disabled" under the ADA and Ohio law because he has a record

26

of an impairment and was regarded as disabled by Deerfield II (doc. 42). In light of this legal landscape, the Magistrate Judge concludes that Plaintiff fails to establish that he has a record of an impairment that substantially limits one or more major life activities (Id.). Plaintiff points to his absence from work, due to an approved Worker's Compensation injury, as establishing his record of disability (Id.). Additionally, Plaintiff submits that Deerfield II did not consider him for employment due to his impairment and this fact assists in establishing his record of disability (Id.). However, the Magistrate Judge reports that Plaintiff's brief fails to identify the impairment(s) which substantially limit his ability to engage in major life activities (Id.). Furthermore, Plaintiff fails to identify the major life activity that is rendered impossible due to this impairment(s) (Id.). Additionally it is reported that Plaintiff failed to present evidence in support of his claim that his wrist, neck and back injuries sustained in August 2001 limited a major life activity (Id.).

Furthermore, the Magistrate Judge notes that Plaintiff has made no attempt to meet the Sutton standard (Id.). He has not presented any evidence indicating what substantial class or broad range of jobs he was precluded from performing as a result of his

alleged impairments (Id.). The Plaintiff's generalized doctor's statements indicating that he be excused from work as well as the doctor's note releasing him back to work do not, concludes the Magistrate Judge, equal an acknowledgment that he was substantially limited in his ability to perform a substantial class of jobs (Id.). Nothing in these statements discusses Plaintiff's physical or mental health, or mentions a specific impairment or disability that caused Plaintiff to be unable to perform a substantial class or broad range of jobs (Id.). At most the doctor's statements indicated that Plaintiff could not perform his particular job (Id.). Thus, the Magistrate Judge reports that Plaintiff has failed to show that his physical condition included an impairment that substantially impaired a major life function of working (Id.).

The Magistrate Judge also reports that Plaintiff fails to establish that he was regarded by Deerfield II as disabled (Id.). Plaintiff additionally fails to present evidence sufficient to lead a rational trier of fact to find Deerfield II believed he had a disability that prevented him from performing a broad class of jobs (Id.). The Magistrate Judge indicates that Plaintiff's reliance on the "100% healed rule," which Plaintiff submits Deerfield II utilized in preventing his return to work until he

had no restrictions, is misplaced (Id.).  Plaintiff cites
Henderson v. Ardco, Inc., 247 F.3d 645, 647 (6th Cir. 2001) in
support of his argument that adherence to the "100% healed rule,"
establishes that Deerfield II viewed him as disabled (Id.).
Henderson states, "[w]here the 100% rule is applied to mildly
impaired persons to exclude them from a broad class of jobs, it
may be treating them as disabled even if they are not . . ."
Henderson at 647.

Plaintiff argues that Deerfield II applied the 100% rule to
exclude him from all jobs at the plant, perceiving him as
disabled (doc. 42).  However, the Magistrate Judge disagrees
(Id.).  First, the Magistrate Judge reports that Plaintiff
presents no evidence that Deerfield II had or has a "100% healed
rule" (Id.).  Rather, Plaintiff provides evidence, via a personal
affidavit, that Deerfield I had a 100% healed rule (Id.).
Second, the Magistrate Judge notes that Plaintiff's doctors'
notes are contradictory, indicating at some points that Plaintiff
could return to work with restrictions and in other instances
could not return to work at all (Id.).  Lastly, the Magistrate
Judge submits that Henderson does not create a per se rule that
an employer's use of the 100% healed rule violates the ADA (Id.).
As such, the Magistrate Judge recommends that this Court grant

29

Defendant's Motion for Summary Judgment as it relates to Plaintiff's disability discrimination claims (Id.).

The Plaintiff argues that he has established a prima facie case of disability discrimination (doc. 45). The Plaintiff notes that "disability" is defined similarly under the ADA and Ohio law (Id.). Plaintiff maintains that under this definition, noted above, that a "record of impairment" exists (Id.). The Magistrate Judge stated that a record of impairment means an individual "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." MX Group Inc. v. City of Covington, 293 F.3d 326, 399 (6th Cir. 2002), citing 28 C.F.R. § 32.104(3).

The Plaintiff maintains that the Magistrate Judge erred in finding that he presented no evidence of a disability or how that disability impacted major life activities (doc. 45). Specifically, the Plaintiff highlights that evidence exists that he suffered a wrist, neck, and back injury, requiring surgery in November 2001 (Id.). Furthermore, Plaintiff notes that he was awarded workers' compensation benefits for a cervical sprain, thoracic sprain, and sprained wrist (Id.). Plaintiff was not released to return to work until February 4, 2002 (Id.). This,

30

avers Plaintiff, clearly establishes that he suffered from physical impairments that prevented him from performing a major life activity - that being, work (Id.).  The Defendant acknowledged that Plaintiff was not considered for employment with Deerfield II because he was an inactive employee - his inactivity being a result of his known impairments (Id.).

Plaintiff argues that he was regarded by Deerfield II as disabled and unable to perform the functions of his job even though, in fact, he was able to perform said functions (doc. 45). Plaintiff notes that the emphasis is not placed on the disability of the employee, but rather "on the perception of the employer regarding the perceived disability." See e.g., MX Group at 340. Plaintiff contends that the evidence indicates that Deerfield II clearly considered him disabled.  First, Plaintiff notes that Deerfield II did not view him as a "qualified" applicant because he was on leave due to injuries.  And, second, Plaintiff notes that he was told not to apply for a position until he was released to work without restrictions (doc. 45).  It would follow from these two facts that indeed Deerfield II considered Plaintiff disabled.  The Plaintiff submits that when Deerfield II adopted its policy of not considering inactive employees for employment, it regarded him as disabled from work, a major life

31

activity (_Id_.).   The Court agrees with Plaintiff.   The Court finds genuine issues of material facts are present which could lead a reasonable trier of fact to conclude: that Deerfield II considered Plaintiff disabled; that Deerfield II considered him unable to perform the functions of his job, even though he was able to with or without reasonable accommodations; that his perceived disability limited a major life activity - namely, the ability to work; and, that Deerfield II discriminated against him as a result of this perceived disability.

Plaintiff's last claim is that Deerfield II violated Ohio public policy by refusing to allow him to submit an application or be considered for employment until his worker's compensation leave was exhausted (_Id_.).   The Magistrate Judge reports that no evidence exists to establish such a claim (_Id_.).   The Plaintiff urges the Court to develop a new public policy claim for "wrongful hiring" under Ohio law, a claim never recognized by the Ohio courts (_Id_.).   The Magistrate Judge suggests declining to do so in the first instance and, because Plaintiff fails to establish a viable federal law claim, should decline to exercise pendent jurisdiction over this claim (_Id_. citing _United Mine Workers v. Gibbs_, 383 U.S. 715 (1966).   The Court agrees with the Magistrate Judge's analysis that a public policy claim for

32

"wrongful hiring" is not currently recognized in Ohio courts. As such, the Court dismisses the Plaintiff's public policy claim without prejudice.

The Court now turns to Defendant's Motion to Strike (doc. 48). This Motion was filed in response to Plaintiff's filing of a "Reply in Support of Plaintiff's Objections to Report and Recommendation" (doc. 47). The Court notes that Rule 72(b) of the Federal Rules of Civil Procedure, dealing with objections and responses to those objections filed subsequent to an issued Report and Recommendation, does not contemplate nor permit any additional filing of objections. Additionally the Court finds that it can rule on the Report and Recommendation without considering the additional objections filed by Plaintiff. Accordingly, the Court GRANTS the Defendant's Motion to Strike.

Therefore, the Court hereby ADOPTS IN PART AND DENIES IN PART the Magistrate Judge's Report and Recommendation (doc. 42). As such, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment (doc. 19). In so doing, the Court notes that remaining in this case are Plaintiff's claim of race discrimination pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 2000e-2, O.R.C. 4112.02(A) and 4112.99 and his claim of disability discrimination under the ADA and sections 4112.02(A) and 4112.99

33

of the Ohio Revised Code.  However, Plaintiff's claim that Defendant violated Ohio Public Policy is DISMISSED.  The Court also DENIES Defendant's Motions to Strike (docs. 35, 48).


    SO ORDERED.



Dated: March 28, 2006       <u>s/S. Arthur Spiegel</u>
                              S. Arthur Spiegel
                              United States Senior District Judge